Filed 11/3/17 (unmodified opn. attached)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>VINCENT PETTIE et al.,<br><br>Defendants and Appellants. | H041739<br>(San Benito County<br>Super. Ct. Nos. CR1300100,<br>CR1300101, and CR1300102)<br><br>**ORDER MODIFYING OPINION<br>AND DENYING REHEARING**<br><br>**NO CHANGE IN THE JUDGMENT** |

THE COURT:

It is ordered that the opinion filed herein on October 10, 2017, be modified as follows:

1. The sentence beginning with "The parties do not address the applicable standard of prejudice" on page 37 shall be deleted and replaced with the following sentence:

    The parties did not address the applicable standard of prejudice in their briefing.

2. The paragraph beginning "Applying this standard," on page 38 and continuing onto page 39 shall be deleted and replaced with the following two paragraphs:

    In a petition for rehearing, the Attorney General contends the failure to give the instruction would constitute an error of state law only, such that the proper standard for prejudice is supplied by *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) [reversal required only if it is reasonably probable the defendant would

have enjoyed a more favorable result in the absence of the error]. For this proposition, the Attorney General cites *People v. Perry* (1979) 100 Cal.App.3d 251 (*Perry*). (See also *People v. Northrop* (1982) 132 Cal.App.3d 1027 [citing *Perry*], disapproved on other grounds in *People v. Smith* (1984) 35 Cal.3d 798.) The Attorney General also contends a defendant's presence can constitute aiding and abetting provided the defendant is present "for the purpose of assisting the crime." (*People v. Boyd*, *supra*, 222 Cal.App.3d at p. 556.) But the trial court gave no such instruction here; nor is this language consistent with CALCRIM No. 401 (requiring the jury to find the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime).

As to prejudice, although the court in *Perry* cited the California Constitution, the court did not analyze the issue and did not clearly state the standard. But we need not decide which standard applies. Assuming *Watson* controls, we conclude it is reasonably probable Pettie would have enjoyed a more favorable result had the court given the instruction. As set forth above, the evidence of his participation in the assault, although sufficient to sustain the convictions, was not strong. Given the prosecution's arguments, the jury's findings may have hinged on the inference that Pettie's status as a Norteño gang member motivated him to aid and abet the attack. Although such an inference would have been reasonable, the evidence to support it—consisting solely of the gang expert's testimony that gang members are obligated to participate in a gang-related assault—did not compel such a finding. We conclude this error requires reversal of Pettie's convictions on Counts 1 through 5. The result would be the same under the standard set forth in *Prettyman*, *supra*.

Respondent's petition for rehearing is denied.

There is no change in the judgment.


Dated: November 2, 2017                    _____
                                           Walsh, J.[*]




                                           _____
                                           Premo, J.



_____

[*]Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

2

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VINCENT PETTIE et al.,<br><br>    Defendants and Appellants. | H041739<br>(San Benito County<br> Super. Ct. Nos. CR1300100,<br> CR1300101, and CR1300102) |

A jury found defendants Philip Garcia, Andrew Lanford, and Vincent Pettie guilty of attempted murder, assault, and witness dissuasion, with gang and firearm enhancements, as the result of an attack on Joseph Delgadillo.  The trial court imposed aggregate terms of 42 years to life on Garcia, and 29 years to life on Lanford and Pettie.[1]

At the time of the assault, defendant Garcia was dating victim Delgadillo's ex-wife.  At some point, Delgadillo's daughter came to his home with bruises and complained that Garcia had hit her.  Delgadillo called the police, but they did not arrest Garcia at that time.  Three weeks later, as Delgadillo was watching football with defendant Lanford, Lanford questioned Delgadillo about calling the police and invited him out to smoke.  Once outside, Delgadillo saw Garcia, defendant Pettie, and another man.  Someone called Delgadillo a "cop caller" and some or all of the men attacked Delgadillo.  Delgadillo saw Garcia point a pistol at him during the attack, but otherwise Delgadillo did not specifically identify which of the men personally participated in the

---

[1] **The trial court imposed both determinate and indeterminate terms but did not specify whether the indeterminate terms were consecutive or concurrent to the determinate terms.**

attack. After suffering injuries, Delgadillo managed to run away. He heard four or five gunshots as he fled.

Defendants raise numerous claims on appeal. We find no merit in the claims of failure to bifurcate, *Brady*[2] violation, juror bias, prosecutorial misconduct, and insufficient evidence, including the claim of insufficient evidence that the Norteños were a unitary gang under *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*).

Defendants also claim the admission of testimonial hearsay through the prosecution's gang expert violated their confrontation rights under *Crawford*[3] and *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). We conclude this claim has merit and requires reversal of the true findings on the gang enhancements. As to Garcia and Lanford, we conclude the *Crawford* violation does not require reversal of the convictions for attempted murder and assault. As to Pettie, however, we conclude the violation requires reversal on all counts.

Finally, defendants raise several claims of instructional error and sentencing error. We conclude the trial court failed its sua sponte duty to give the "mere presence" portion of CALCRIM No. 401 as it related to Pettie's role in aiding and abetting the assault. The trial court also failed to instruct the jury on the requisite mens rea for witness dissuasion. These errors require reversal of the convictions on the relevant counts. We grant further relief on one claim of sentencing error. We will reverse the judgments and remand for further proceedings.

---

[2] ***Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*).**
[3] ***Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*).**

# I. FACTUAL AND PROCEDURAL BACKGROUND

A. *Facts of the Offenses*

1. *Overview*

In 2012, Joseph Delgadillo was engaged in a custody dispute with his ex-wife. Delgadillo's ex-wife was dating Philip Garcia at the time. In November 2012, Delgadillo's daughter came to his home with bruises and told Delgadillo that Garcia had hit her. Delgadillo reported the incident to the Hollister Police Department, but the police did not arrest Garcia at that time.

On the evening of December 6, 2012, Delgadillo went to his cousin's house in Hollister to watch a football game with Andrew Lanford and others. Delgadillo subsequently gave police the following account of the evening: At some point, Lanford began asking Delgadillo why he had called the police about the incident with his daughter and Garcia. Lanford then invited Delgadillo outside for a cigarette. As they were walking outside, Lanford questioned Delgadillo again about calling the police. Once outside, Delgadillo saw three other persons: Garcia, Pettie, and a man identified only as "Robert." Delgadillo was called a "cop caller," and a fight ensued. In the course of the fight, Delgadillo's sweatshirt was pulled up over his head and he was knocked to the ground. Someone struck him on the head with a hard object, which he believed to be a gun. As he was getting up, he saw Garcia pointing a gun in his face. Delgadillo then ran away. As he fled, he heard four or five gunshots. Delgadillo suffered a laceration on his head and several bruises and scratches, but he escaped without further injury.

At trial, Delgadillo recanted the substance of these allegations. The prosecution introduced his hearsay statements to the police as prior inconsistent statements. The prosecution also introduced evidence that Lanford, Garcia, and Pettie were members of the Norteño criminal street gang.

## 2. *Testimony of Joseph Delgadillo*

Delgadillo reluctantly testified for the prosecution under subpoena. He testified that his cousin, Yanina Torres, was married to Andrew Lanford. He admitted that he called the police on November 12, 2012, to report his daughter's claims that Garcia had hit and bruised her. He explained that he was trying to get custody of his children because he believed his ex-wife was unfit to care for them.

When asked about the night of December 6, 2012, Delgadillo testified that he could not recall being assaulted at his cousin's house. He claimed he had blacked out after drinking, and said it was "[k]ind of like a bad dream." He could not recall talking to the police or anyone else about what happened that night. He testified that he "wasn't in the right state of mind" because he was "going through a lot in my life at the time." He claimed that anything he must have told the police was the product of anger and confusion. When asked about the allegations that police said he had made against Garcia, Lanford, and Pettie, Delgadillo responded that any such allegations would have been lies.

When asked why he was reluctant to testify, Delgadillo responded, "I've moved on with my life. None of this concerns me." When asked if he was concerned about testifying, he responded, "There's always concerns. I mean, I've been living watching over my shoulder since this all began." He denied that anyone had told him not to testify but added, "I have kids and I have family and it doesn't matter regardless of whatever; you know? Obviously, I'm going to take their best interest in mind; so, like I said, I've moved on."

## 3. *Testimony of Deputy Sheriff Michael Mull*

On the evening of December 6, 2012, San Benito County Deputy Sheriff Michael Mull received a dispatch call reporting gunshots fired and males fighting around the 1500 block of Nash Road. Upon arriving at the scene, Deputy Mull and his partner, Deputy Sheriff Marc Williams, found some blood-stained clothing in front of a fence outside. Deputy Mull saw blood drops leading up to the front of the house at 1440 Nash

4

Road.  He questioned Jynnita Torres (Yanina Torres' sister) at the house while Deputy Williams questioned another woman.[4]

Jynnita said she had heard some gunshots followed by a strange man in a black sweatshirt and jeans running into the house.  She said the man cleaned up in the kitchen and ran away.  Deputy Mull saw blood drops inside the house, so he followed them into the house and searched the living room, a bedroom, and the kitchen.  He did not see any blood or bloody rags in the kitchen, and he did not believe Jynnita was telling him the entire truth.

Deputy Mull later found a single bullet casing on the ground outside.  He also spoke with a neighbor who described seeing several subjects fighting in the street.  The neighbor said they sped away in an SUV, and he reported hearing a gunshot.

Later that night, a dispatcher informed Deputy Mull that a victim of an assault at the Nash Road residence wished to file a report.  When Deputy Mull arrived at the victim's residence, he saw Delgadillo, Degadillo's mother, and another relative.  Delgadillo had a laceration above his left eye, and he appeared to have been involved in an assault.  The laceration was one to two inches long.  He had scratches and blood on his head, and bruising and abrasions on his arm and leg.

Delgadillo gave Deputy Mull the following account:  Delgadillo had been watching a football game at his cousin's home at Nash Road.  Lanford was there.  As they were watching the game, Lanford started asking Delgadillo why he had call the police about the issues he was having with his ex-wife and Garcia.  At some point, Lanford went outside briefly and came back inside.  He asked Delgadillo to go outside to smoke a cigarette with him.  As they went outside, Lanford continued to question Delgadillo about calling the police on Garcia.  Once they got outside, Delgadillo saw

---

[4] **We will refer to the Torres family members by their first names to avoid confusion.**

three additional persons: Garcia, Pettie, and a man named "Robert" whose last name Delgadillo did not know.

Delgadillo heard someone call him a "cop caller" and a fight ensued. During the course of the fight, his sweatshirt was pulled up over his head. He was then hit on the head with a hard object which he believed to be a gun. At that point, he was trying to get up off the ground. As he looked up, he saw Garcia pointing a gun directly into his face at close proximity. Delgadillo then ran away. As he was running away, he heard four or five gunshots.

Deputy Mull asked Delgadillo how he knew the men. Delgadillo said he had known Lanford for at least 10 years, and that Garcia was his ex-wife's boyfriend. Delgadillo said he had gone to school with Pettie. When Deputy Mull asked Delgadillo if he wished to pursue criminal charges against the men, Delgadillo responded, "What do you think, they tried to fucking kill me?" Delgadillo did not appear intoxicated.

The next day, Deputy Mull took Delgadillo to the county jail and showed him three separate "six pack" photo lineups—one with Garcia, one with Lanford, and one with Pettie. Delgadillo identified the photos of each of the three men. Deputy Mull asked him again what had happened the night before, and Delgadillo gave an account consistent with his prior statement.

4. *Testimony of Patricia Torres*

Patricia Torres is Delgadillo's mother. She was present in court when he testified. At some point during his testimony, she got up and left the courtroom. The prosecution later called her as a witness. Patricia testified that she left the courtroom during Delgadillo's testimony because some of the things he said were not true and she believed he was in fear for his life. She said he had previously told her he had been threatened, but he did not say who threatened him.

When asked about the night of the assault, Patricia testified as follows. Delgadillo got home from work early that day so they could watch sports together. Delgadillo then

6

got a phone call from his cousin. After Delgadillo got off the phone, he told Patricia he was going to his cousin's house to watch the football game with his cousin and Lanford. Later, Delgadillo called Patricia and said he had been attacked during a fight with Lanford because of Delgadillo's having called the police. Delgadillo then came home with a knot on his head and told Patricia he had been hit with a gun. He said Lanford and Garcia were there, but he did not name anyone else.

5. *Other Witnesses*

Jynnita Torres is Delgadillo's cousin and Yanina's sister. She lived at the Nash Road residence. She was present on the night of the assault, and she testified that Lanford was there as well. She recalled the police coming to the house, but she testified that she did not recall making various statements to the police about the assault. She could not recall telling the police she heard gunshots. She admitted telling police a strange person with blood on him had entered the house, but stated that she "thought he had fell." She also admitted that she knew that person was Delgadillo but explained that she had lied to police because she thought he was drunk, and because she was afraid and confused. She could not recall many details of the incident.

Orlando Perez, Jynnita's boyfriend, was also at the house on the night of the assault. He testified that he did not hear any gunshots. He denied telling the police that Delgadillo and Lanford were there. He admitted in his testimony, however, that Delgadillo and Lanford were there "at some point." He testified that he did not hear any conversation between them while they were watching the football game.

6. *The Prosecution's Gang Evidence*

Deputy Mull testified for the prosecution as an expert in criminal street gangs. He opined that all three defendants were members of the Norteño criminal street gang. When asked about a hypothetical offense with facts similar to those set forth above, he opined that such an offense would benefit and promote the gang.

7

Deputy Mull testified that the Norteño gang was the predominant criminal street gang in San Benito County. He estimated that there were around 50 to 100 members or associates of the Norteño gang in Hollister. Norteños identify with the color red, the number "14", the Roman number "XIV", and the letter "N", which is the 14th letter of the alphabet. They also identify with the symbol of the Huelga bird, a four-tiered bird that was previously identified with Cesar Chavez and the farm labor movement. Gang members display graffiti or wear clothing and tattoos associated with these symbols. Norteños may also identify with a specific gang clique such as the Hollister Norteño gang, the Westside Locos, the Eastside Norteños, B.H.T., the Crestsiders, and the Hazel Block gang.

Deputy Mull testified that the main or primary purposes of the Norteño gang include narcotics trafficking and selling. They also commit crimes such as murders and assaults to strike fear into their own members and others.

a. *Gang Evidence as to Philip Garcia*

Deputy Mull opined that Garcia was a Norteño member based on his tattoos, his clothing, his associations with other gang members, and his criminal behavior. Garcia had tattoos of "Eastside" on his upper back and "E.S.S.J." on his left hand, signifying his association with Eastside San Jose. Deputy Mull testified that Eastside San Jose is a "gang designated area" of San Jose. Garcia had a tattoo of a man with four dots under an eye on his left forearm. Deputy Mull opined that this signified the number "14". Garcia also had a tattoo of a skull with clowns on his left forearm. Deputy Mull testified that such tattoos sometimes have gang significance.

Deputy Mull testified to five police reports of prior law enforcement contacts with Garcia and others. On July 11, 2003, a Hollister police officer saw Garcia wearing a red T-shirt and red sweats, and the officer observed a "XIV" shaped scar on Garcia's forearm. On December 6, 2003, an officer from the San Benito County Sheriff's office saw Garcia wearing a red shirt, black pants, and white shoes. On November 4, 2006, a

8

Hollister police officer contacted Garcia together with two known Norteño gang members. On July 25, 2010, police contacted Garcia with a woman who "commonly associates with Norteño gang members." On November 19, 2011, a Gilroy police officer contacted Garcia with two other women, after which Garcia was charged and convicted for felony possession of a firearm. However, Garcia was not charged with any gang enhancement or gang-related offense in that incident.

Law enforcement officers conducted a warrant search of Garcia's residence. Officers found various items of red clothing, including a white-and-red checkered shirt; a pair of red sneakers with a San Francisco 49er logo; a black Cincinnati Reds hat with a red "C"; and a black T-shirt with the writing "Everyday Cali Since Day One" in red lettering. Officers also saw a red San Francisco 49ers logo on the wall.

b. *Gang Evidence as to Andrew Lanford*

Deputy Mull opined that Lanford was a Norteño member based on law enforcement contacts with him, his tattoos, his clothing, and his past criminal behavior. Lanford's tattoos included "SIV" on his back, an "X4" on his right forearm, an "H" on his left hand, and Aztec writing on his forehead. Deputy Mull opined that the Aztec writing, spelled "IXPOL", stood for "Northerner", and the "H" stood for Hollister.

Deputy Mull testified to numerous reports of prior police contacts with Lanford and others. On July 29, 2003, Hollister police contacted Lanford together with two known Norteño gang members. On May 10, 2003, a member of the San Benito County Sheriff's office documented Lanford throwing gang signs. On September 1, 2003, Hollister police contacted Lanford together with a known Norteño gang member. On March 15, 2004, Deputy Mull contacted Lanford and saw him wearing a San Francisco 49er sweater and a red belt with the letter "N" inscribed on the buckle. On March 22, 2004, Hollister police contacted Lanford together with a known Norteño gang member. On May 26, 2004, Hollister police again contacted Lanford together with a known Norteño gang member. On June 23, 2006, a deputy sheriff contacted Lanford with two

9

other persons, one of whom was a Norteño associate. After an incident on November 24, 2004, Lanford was convicted for possession of a concealed weapon. On September 13, 2010, police contacted Lanford with a known Norteño gang member.

### c. *Gang Evidence as to Vincent Pettie*

Deputy Mull opined that Pettie was a Norteño gang member based on his associations with other Norteños, his tattoos, and his possession of gang-related clothing. Pettie had a tattoo of "Hollis" on his chest, which Deputy Mull stated was short for "Hollister." Deputy Mull testified that gang members often get tattoos naming their home towns. Pettie had a tattoo of a skull pointing a pistol, with a red bandana on the skull's face. Deputy Mull testified that the bandana had four dots on it, signifying the number "14."[5] Pettie had a tattoo of "V.H." on his torso, which Deputy Mull testified stood for Via Hermosa. Pettie also had a tattoo of an Aztec warrior on his right arm, but Deputy Mull could not testify with certainty that it was a gang-related tattoo. Pettie also had tattoos of the names of girlfriends or relatives.

Deputy Mull testified to numerous prior police reports of Pettie associating with other gang members or wearing red clothing. On October 24, 2003, police contacted Pettie in a vehicle containing two red Nebraska Cornhusker baseball caps. Pettie was wearing a red cloth belt. On October 14, 2004, police contacted Pettie with a known Norteño. On November 11, 2004, police saw Pettie wearing a red jersey with a red shirt underneath. On April 24, 2005, Deputy Mull and another officer detained Pettie and other subjects. Pettie was wearing a red baseball cap with the letter "N", and one of the other subjects was a known Norteño. On October 21, 2005, police contacted Pettie with two known Norteños. Pettie was wearing red clothing. On January 12, 2006, police contacted Pettie with a known Norteño. On July 6, 2007, police documented Pettie wearing a white baseball cap with a red "S.F." on the cap. On October 15, 2010, police

---

[5] **A photograph of the tattoo shows the bandana has 27 dots in several clusters of two or four.**

10

contacted Pettie with a Norteño member or associate. On May 18, 2011, police contacted Pettie again with that member or associate. On May 21, 2012, police contacted Pettie with another known Norteño member.

In January 2013, a probation officer conducted a search of Pettie's residence. Deputy Mull testified that a number of clothing items found in Pettie's bedroom were gang-related. These included a black T-shirt with a picture of a hand in the shape of a "W"; a black shirt with "187" on it; a black sports jersey with red sleeves; a black T-shirt with the design of a woman wearing a black and red bandana and the word "Hustler" in red; a San Francisco 49ers shirt showing "CalNiner" with the "N" in red; three San Francisco Giants caps in red, white, and black; and a shirt that said "Nor Cali" with a red star. The officer also found a blanket with the film character "Scarface" on it, a photograph of Pettie wearing a red tank top, and several music CDs with gang-related symbols and music.

With respect to all three defendants, Deputy Mull also relied on the facts of the instant offense to support his opinion that they were members of the Norteño gang.

7. *Gang Expert for Lanford*

Mark Harrison, a retired detective, testified as a gang expert on behalf of Lanford. Harrison testified that many people who are not gang members or associates wear gang-related clothing, display gang-related symbols, or listen to gang-related music. When asked about a hypothetical set of facts similar to the alleged facts of the instant assault, Harrison testified that the question of whether the fight was gang related would depend on the motive for the assault. Harrison opined that if the assault happened because one man was dating another man's ex-wife, then the assault would not be gang related. Similarly, Harrison opined that if the attacker was motivated by the fact that the ex-husband had called the police on his wife, the assault would not be gang related.

11

B. *Procedural Background*

The prosecution charged each defendant with six counts: Count 1—Attempted murder (Pen. Code, §§ 187, subd. (a), 664)[6]; Count 2—Assault with a firearm (§ 245, subd. (a)(2)); Count 3—Dissuading a witness by force or threat (§ 136.1, subd. (c)(1)); Count 4—Dissuading a witness in furtherance of a conspiracy (§ 136.1, subd. (c)(2)); Count 5—Assault by means likely to produce great bodily injury (§ 245, subd. (a)(4); and Count 6—Active participation in a criminal street gang (§ 186.22, subd. (a)).

As to each defendant on Counts 1 through 5, the prosecution alleged the offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang. (§ 186.22, subds. (b)(1)(B), (b)(1)(C), & (b)(4).) As to each defendant on Count 1, the prosecution alleged that a principal personally and intentionally discharged a firearm. (§ 12022.53, subds. (c) & (e)(1).) As to Counts 3, 4, 5, and 6, the prosecution alleged all defendants personally inflicted great bodily injury upon the victim. (§ 12022.7, subd. (a).)

As to both Pettie and Lanford, the prosecution alleged on all counts that a principal was armed with a firearm (§ 12022, subd. (a)(1).)

As to Lanford only, the prosecution further alleged on all counts that he had suffered a prior prison term. (§ 667.5, subd. (b).)

As to Garcia only, the prosecution alleged that he carried a firearm on his person or in a vehicle (§12021.5, subd. (a)); and as to Counts 2 and 6, that he personally used a firearm (§ 12022.5, subds. (a) & (d)).

A jury was sworn on April 25, 2014, and opening arguments were held on April 28. On May 2, 2014, the jury found defendants guilty on all counts and found true all special allegations.

---

[6] **Subsequent undesignated statutory references are to the Penal Code.**

12

As to each defendant, the trial court imposed an indeterminate term of seven years to life on Count 4. (§ 186.22, subd. (b)(4)(C).) As to both Lanford and Pettie, the court imposed a determinate term of 29 years, composed of the upper term of nine years on Count 1 consecutive to 20 years for the firearm enhancement. (§ 12022.53, subds. (c) & (e)(1).) As to Garcia, the court imposed a determinate term of 42 years, composed of the upper term of nine years on Count 1 consecutive to terms of 20 years for personally discharging a firearm (§ 12022.53, subd. (c)), 10 years for the gang enhancement (§ 186.22, subd. (b)(1)(C)), and three years for carrying a firearm (§ 12021.5, subd. (a)). The court granted the prosecution's motion to dismiss Count 6 in its entirety, and the court stayed all remaining terms under section 654. The court did not specifically state whether the indeterminate terms were consecutive to the determinate terms.

## II. DISCUSSION

### A. *The Denial of Defendants' Motion to Bifurcate the Gang Charges*

All three defendants contend the trial court erred in denying their pretrial motions to bifurcate the gang charges and enhancements. Defendants argue that the introduction of irrelevant, unreliable, and inflammatory evidence contravened state law rules of evidence and violated their constitutional rights to due process and a fair trial. The Attorney General contends the court properly denied the motions to bifurcate because the gang-related evidence was an integral part of the prosecution's case in proving motive and the victim's reluctance to testify. We conclude the trial court did not abuse its discretion by denying the motions to bifurcate, and the introduction of gang-related evidence did not render the trial unfair.

#### 1. *Procedural Background*

Garcia moved pretrial to bifurcate the substantive gang charge (Count 6) and all gang enhancements. He argued the evidence would be unduly prejudicial and lacking in probative value with respect to the remaining charges because the latter were not gang related. Pettie and Lanford joined the motion. The trial court denied the motion.

13

After the close of evidence, the trial court instructed the jury consistent with CALCRIM No. 1403 as follows:  "In this case there's been evidence of gang activity. You may consider that evidence only for the limited purpose of deciding whether the defendant acted with the intent, purpose and knowledge that are required to prove the gang-related crimes and/or enhancement.  [¶]  You may not consider that evidence for any other purpose.  You may not conclude from the evidence that the defendant is a person of bad character or that he has a disposition to commit crimes."

2.  *Legal Principles*

As the Attorney General notes, defendants use the term "bifurcate" in referencing both the substantive gang participation charge in Count 6 as well as the enhancements. Courts generally refer to "severance" when separating a trial on charged offenses. Although there is much overlap in the rules governing severance and bifurcation, the laws and purposes regarding each are somewhat distinct.  (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1050 (*Hernandez*) [comparing severance and bifurcation].)  Because the parties moved below to separate the trial on both the enhancements and the substantive gang-related charge, we will consider defendants' claim as an appeal from a denial of a motion to sever Count 6 and bifurcate the enhancements.

Section 954 governs the joinder of multiple charges in a single accusatory pleading.  "An accusatory pleading may charge two or more different offenses connected together in their commission . . . or two or more different offenses of the same class of crimes or offenses . . . ."  (§ 954.)  However, the trial court "in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."  (*Ibid.*)  "When . . . the statutory requirements for joinder are met, a defendant must make a clear showing of prejudice to establish that the trial court abused its discretion in denying the defendant's severance motion. [Citations.]  In determining whether there was an abuse of discretion, we examine the

14

record before the trial court at the time of its ruling.  [Citation.]  The factors to be considered are these:  (1) the cross-admissibility of the evidence in separate trials; (2) whether some of the charges are likely to unusually inflame the jury against the defendant; (3) whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome of some or all of the charges; and (4) whether one of the charges is a capital offense, or the joinder of the charges converts the matter into a capital case." (*People v. Mendoza* (2000) 24 Cal.4th 130, 160-161 (*Mendoza*).)  "Even if a trial court's severance or joinder ruling is correct at the time it was made, a reviewing court must reverse the judgment if the 'defendant shows that joinder actually resulted in "gross unfairness" amounting to a denial of due process.' [Citation.]" (*Id.* at p. 162.)  "[E]rror involving misjoinder 'affects substantial rights' and requires reversal . . . [if it] results in actual prejudice because it 'had substantial and injurious effect or influence in determining the jury's verdict.' " (*U.S. v. Lane* (1986) 474 U.S. 438, 449.)  The defendant must demonstrate a reasonable probability that the joinder affected the jury's verdicts.  (*People v. Bean* (1988) 46 Cal.3d 919, 938-940.)

"[A] trial court has the discretion, in a jury trial, to bifurcate the determination of the truth of an alleged prior conviction from the determination of the defendant's guilt of the charged offense, but is not required to do so if the defendant will not be unduly prejudiced by having the truth of the alleged prior conviction determined in a unitary trial." (*People v. Calderon* (1994) 9 Cal.4th 69, 72.)  However, "[a] prior conviction allegation relates to the defendant's *status* and may have no connection to the charged offense; by contrast, the criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense.  So less need for bifurcation generally exists with the gang enhancement than with a prior conviction allegation." (*Hernandez*, *supra*, 33 Cal.4th at p. 1048.)

"This is not to say that a court should never bifurcate trial of the gang enhancement from trial of guilt." (*Hernandez, supra,* 33 Cal.4th at p. 1049.)  "But

15

evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary." (*Id.* at pp. 1049-1050.) "[W]hen the evidence sought to be severed relates to a charged offense, the 'burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried. [Citations.]' " (*Id.* at p. 1050.)

       3. *Denial of the Motion to Bifurcate or Sever Was Not an Abuse of Discretion*

We first consider whether the trial court should have severed the substantive gang participation charge (Count 6) from the remaining charges. For the purposes of this analysis, we will assume the trial court also would have bifurcated the gang-related enhancements in the event it had granted the motion to sever. In other words, we will consider the cross-admissibility of the gang evidence as a whole with respect to the non-gang charges and allegations in Counts 1 through 5.

It is undeniable that the introduction of gang-related evidence presents a danger of undue prejudice. "We have recognized that admission of evidence of a criminal defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged." (*People v. Williams* (1997) 16 Cal.4th 153, 193.) "[E]ven where gang membership is relevant, because it may have a highly inflammatory impact on the jury, trial courts should carefully scrutinize such evidence before admitting it." (*Ibid.*) Some gang evidence relating to defendants "may be so extraordinarily prejudicial, and of so little relevance to

16

guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt."  (See *Hernandez, supra,* 33 Cal.4th at p. 1049 [in the context of bifurcation].)

Here, however, evidence of gang membership was probative to the charges in Counts 1 through 5 in three respects.  First, three of the prosecution's witnesses— including the victim, most significantly—testified that they could not recall many details about the night of the assault, and they denied having made numerous statements to the police about the incident.  Delgadillo denied he had been told not to testify, but admitted he had been "living watching over my shoulder" and expressed concerned for the wellbeing of his family.  Evidence of defendants' gang involvement was therefore probative to explain why a witness might be reluctant or afraid to testify against them. (See *People v. Harris* (1985) 175 Cal.App.3d 944, 957 [evidence of gang membership was relevant on possible threats to prosecution witnesses, resulting in obvious bias during testimony].)

Second, evidence of gang membership was probative to show defendants' motive for assaulting Delgadillo, particularly as to Lanford and Pettie.  The record holds no evidence that Lanford and Pettie had any involvement in Delgadillo's child custody dispute or the incident that caused him to contact the police.  The prosecution's theory was that Lanford and Pettie participated in the retaliatory assault as part of a gang-motivated "beat down."  To support this theory, the prosecution introduced the testimony of Deputy Mull that gang members are expected and obligated to participate in such assaults on behalf of a fellow gang member.  Deputy Mull testified that if a gang member refuses to participate in such an attack, that member risks being attacked by his or her fellow gang members.  Evidence of defendant's gang membership thereby supplied a motive for Lanford and Pettie to participate in the assault on Delgadillo apart from the prior disputes between Delgadillo and Garcia.  (*Hernandez, supra,* 33 Cal.4th at p. 1049 [evidence of gang affiliation can help prove identity and motive].)

17

Third, the prosecution charged defendants with acting in furtherance of a conspiracy, in which defendants are liable for acts committed as a natural and probable consequence of the conspiracy. The trial court instructed the jury that a natural and probable consequence is one that a reasonable person would know is likely to happen under the circumstances. Deputy Mull testified that gang members engaged in "beat down" attacks would know and understand in advance that the possible outcomes of the attack include murdering the victim. In closing, the prosecution argued that a gang member "knows that anything from a beat down to a murder can happen. You heard the Judge talk about natural and probable consequences. That's what we're talking about." Accordingly, evidence of defendants' gang membership was relevant to show their state of mind regarding the consequences of the conspiracy. (*Hernandez, supra,* 33 Cal.4th at p. 1049 [evidence of gang affiliation can help prove specific intent].)

Additionally, the prosecution and its expert witness relied on defendants' commission of the assault as a potential predicate offense to establish the existence of a criminal street gang under subdivision (e)(1) of section 186.22. Evidence of the assault was therefore relevant to show the defendants were active participants in a gang as charged in Count 6.

For all these reasons, evidence of defendants' gang membership was cross-admissible to prove the commission of the attempted murder and assault charges. Similarly, evidence of the attempted murder and assault charges was cross-admissible to prove defendants' active participation in a criminal street gang. And while gang-related evidence is necessarily inflammatory to some degree, the gang evidence presented here was substantially outweighed by its probative value. The trial court properly instructed the jury on the limited uses of gang-related evidence, and absent some showing to the contrary, we assume the jury adhered to those instructions. Moreover, joinder of charges here did not constitute "a weak case . . . joined with a strong case or another weak case" such that the total evidence might "alter the outcome of some or all of the charges."

18

(*Mendoza, supra,* 24 Cal.4th at p. 161.) Nor did any of the charges involve a capital offense. Based on the factors set forth in *Mendoza*, we conclude the court did not err in denying any motion to sever. We further conclude joinder did not result in such "gross unfairness" as to result in a denial of due process.

Given that Count 6 was properly joined with Counts 1 through 5, defendants cannot show cause for the bifurcation of the gang-related enhancements. "To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary." (*Hernandez, supra,* 33 Cal.4th at pp. 1049-1050.) "When the offenses are joined for trial the defendant's guilt of all the offenses is at issue and the problem of confusing the jury with collateral matters does not arise." (*Id.* at p. 1050.)

In support of their argument for bifurcation, defendants rely on *People v. Albarran* (2007) 149 Cal.App.4th 214, 217 (*Albarran*). The Attorney General accurately points out that *Albarran* did not involve a substantive gang charge, as this case does. For that reason alone, *Albarran* is inapposite. Nonetheless, even assuming the prosecution had not charged Count 6, we conclude for the reasons above that the gang-related evidence was sufficiently probative to the remaining counts to outweigh whatever danger of prejudice the evidence presented. Evidence of defendant's gang involvement was highly probative to their motive for mounting the assault, their state of mind as to the consequences of the assault, and the possibility of bias in the testimony of three reluctant witnesses. In *Albarran*, by contrast, the court found insufficient evidence to support the prosecution's claim that the underlying offenses were motivated by a desire to gain respect and enhance the defendant's reputation within the gang. (*Id.* at p. 227.) Furthermore, the prosecution in that case presented a large volume of extremely inflammatory and incriminating gang evidence that had no connection to the charged crimes. (*Id.* at pp. 227-228.) *Albarran* is therefore distinguishable from this case, in which the gang-related evidence was comparatively less inflammatory.

19

Defendants have not shown that the reasons supporting admission of the evidence were outweighed by a substantial danger of under prejudice.  We conclude the trial court did not abuse its discretion in denying defendants' motion to sever or bifurcate, and the introduction of gang-related evidence did not violate defendants' due process rights.

B.  *Sufficiency of the Evidence Supporting the Gang Charges and Allegations*

Defendants contend the evidence was insufficient to support convictions and true findings on the gang-related charges and allegations.  The central thrust of their argument is that the prosecution failed to prove the existence of a criminal street gang under section 186.22 and *Prunty*, *supra*, 62 Cal.4th 59.  Lanford further contends the prosecution failed to present sufficient evidence to show the offenses were committed in association with or for the benefit of the gang.  The Attorney General argues that the prosecution presented substantial evidence to show the Norteño gang constitutes a unitary criminal street gang and that defendants committed the offenses for the benefit of the gang.

We conclude the record holds sufficient evidence to establish the Norteños as a criminal street gang under section 186.22 and that defendants committed the offenses for the benefit of that gang.

1.  *Legal Principles*

"In reviewing the sufficiency of evidence under the due process clause of the Fourteenth Amendment to the United States Constitution, the question . . . is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Rowland* (1992) 4 Cal.4th 238, 269, quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 319.)  The California Constitution requires the same standard.  (*Ibid.*)  "In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court 'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Johnson*

(1980) 26 Cal.3d 557, 576.)  This standard applies even when the prosecution relies primarily on circumstantial evidence.  (*People v. Maury* (2003) 30 Cal.4th 342, 396.)

Section 186.22 defines a "criminal street gang" as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission" of one or more certain enumerated offenses, "having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity."  (§ 186.22, subd. (f).)  Subdivisions (e) and (j) of that section further define "a pattern of gang activity" by the commission of certain predicate offenses by two or more persons on separate occasions within certain time periods.

The statute "requires that the gang the defendant sought to benefit, the individuals that the prosecution claims constitute an 'organization, association, or group,' and the group whose actions the prosecution alleges satisfy the 'primary activities' and predicate offense requirements of section 186.22(f), must be one and the same."  (*Prunty, supra,* 62 Cal.4th at pp. 75-76.)  The requirement of an "organization, association, or group [] calls for evidence that an organizational or associational connection unites the 'group' members.  When . . . the prosecution relies on the conduct of subsets to show a criminal street gang's existence, the prosecution must show a connection among those subsets, and also that the gang those subsets comprise is the same gang the defendant sought to benefit."  (*Id.* at p. 85.)  "That connection may take the form of evidence of collaboration or organization, or the sharing of material information among the subsets of a larger group.  Alternatively, it may be shown that the subsets are part of the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together.  And in other cases, the prosecution may show that various subset members exhibit behavior showing their self-identification with a larger group, thereby allowing those subsets to be treated as a single organization."  (*Id.* at p. 71.)  "[I]t is not enough . . . that the group simply shares a common name, common identifying symbols, and a

21

common enemy.  Nor is it permissible for the prosecution to introduce evidence of different subsets' conduct to satisfy the primary activities and predicate offense requirements without demonstrating that those subsets are somehow connected to each other or another larger group."  (*Id.* at p. 72.)

> 2. *The Evidence Was Sufficient to Establish the Norteños as a Criminal Street Gang and to Prove the Related Enhancements*

The prosecution's theory was that the Norteño gang was the criminal street gang at issue for purposes of section 186.22.  Defendants claim the prosecution failed to show the Norteño gang is a unitary criminal street gang as opposed to a group of separate cliques or subset gangs that "operate under the general umbrella of Norteños."  Defendants are correct that Deputy Mull identified geographically distinct cliques with whom Norteños associate, such as the Hollister Norteño gang, the Westside Locos, the Eastside Norteños, B.H.T., the Crestsiders, and the Hazel Block gang.  But Deputy Mull also testified that the Norteños as a whole constituted a criminal street gang under section 186.22, and he testified to the various elements required to prove a criminal street gang under the statute.

Specifically, Deputy Mull testified that the Norteño gang consisted of at least 500 members in California whose primary purpose is to engage in a pattern of criminal activity and to make money through acts of criminal behavior.  He testified that one of their main purposes is the trafficking and selling of narcotics, and they commit crimes such as murder and assault to control their own members and strike fear into others.  This testimony was sufficient to establish the Norteños as a "group of three or more persons . . . having as one of its primary activities the commission" of certain offenses enumerated in subsection (e) of section 186.22.  (See § 186.22, subds. (e)(3) [homicide or manslaughter], & (e)(4) [drug trafficking]).  Lanford contends Deputy Mull's testimony on the gang's primary activities was "conclusory and unexplained," but under the standard of review required here, we conclude a reasonable jury could have found sufficient proof of the gang's primary activities.

22

Deputy Mull also testified that Norteños identify with the color red, the number "14", the Roman number "XIV", the letter "N", and the symbol of the Huelga bird. He testified that Norteños display graffiti or wear clothing and tattoos associated with these symbols. This testimony was sufficient to establish that Norteños have "a common identifying sign or symbol." (§ 186.22, subd. (f).)

Deputy Mull further testified to numerous qualifying predicate offenses committed by Norteño members—who were not identified as members of any subset—in the three years preceding trial. This list included the instant offenses. (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1383 [the charged offense can be considered as part of the pattern of criminal gang activity].) Lanford complains that the offenses were only "sparsely described," but nothing in the statute requires the prosecution to establish the underlying facts or details of the predicate offenses apart from the dates and the fact that they were committed by the specified gang members.

Defendants contend that the prosecution could not demonstrate the existence of the Norteños as a unitary criminal street gang. The *Prunty* court, however, specifically declined to hold that a broader "umbrella" group such as the Norteños or Sureños could not constitute a criminal street gang under section 186.22. "[N]othing in this opinion reflects any skepticism regarding the general factual question of whether the Norteños exist . . . . We have previously upheld gang enhancements where the 'criminal street gang' in question was a geographically dispersed group. [Citation.] While we find the evidence here insufficient, nothing in our opinion reflects doubt that prosecutors can prove the existence of such a criminal street gang when the evidence supports such a conclusion." (*Prunty, supra,* 62 Cal.4th at p. 85.) The court held that *Prunty*'s requirements only apply "where the prosecution's theory of why a criminal street gang exists turns on the conduct of one or more gang subsets, not simply to those in which the prosecution alleges the existence of 'a broader umbrella gang.' " (*Id.* at p. 71, fn. 2.)

23

Defendants contend that, under *Prunty*, the prosecution was required to show some nexus between the Norteño gang and the cliques or subset gangs identified by Deputy Mull. But the issue of establishing a nexus between subsets arose in *Prunty* only because the prosecution's expert in that case failed to present evidence showing the different subsets were connected to each other or to the broader Norteño gang. (See *Prunty, supra,* 62 Cal.4th at p. 91 [the issue arises "only when the prosecution seeks to prove a street gang enhancement by showing the defendant committed a felony to benefit a broader umbrella gang, but seeks to prove the requisite pattern of criminal gang activity with evidence of felonies committed by members of subsets to the umbrella gang," conc. opn. of Corrigan, J.].) Here, by contrast, the prosecution's case hinged on proving the existence of Norteños as a unitary gang under section 186.22. Furthermore, the prosecution's theory was that the defendants were Norteños, not members of a subset gang. The prosecution's expert testified to the primary activities of the Norteño gang as a whole. (See *People v. Margarejo* (2008) 162 Cal.App.4th 102, 108 [expert's testimony as to primary activities of the gang constituted sufficient evidence].) And the predicate offenses were all committed by Norteño members for the benefit of that gang, not for the benefit of any subset gang. (See *People v. Ewing* (2016) 244 Cal.App.4th 359, 372 [*Prunty* does not apply where the prosecution does not proffer the predicate crimes of subset gang members to prove the existence of a criminal street gang].)

Given the definition of a criminal street gang in section 186.22, subdivision (f), we conclude the prosecution presented sufficient evidence to establish the existence of such a gang. Although the prosecution also presented evidence of other Norteño cliques, neither the existence of these cliques nor the connections between them were necessary to prove the gang-related charges and allegations in this case. Even assuming the prosecution was required to prove associational or organizational connections, the prosecution's expert did so. For example, Deputy Mull testified to the hierarchical structure of the gang, headed by the "top leaders" functioning from inside prisons to "get their word out" to the

24

Norteño gang members on the street. He added that if the "lower echelon" gang members began creating problems with other gangs, "they're going to be dealt with." He further testified that the "higher-ups" may order lower level members to assault fellow members within the gang for failure to obey orders. (See *Prunty, supra*, 62 Cal.4th at p. 71 [prosecution may satisfy requirement of organizational connection by showing that the subsets are part of the same loosely hierarchical organization].)

Lanford contends the prosecution failed to present sufficient evidence to show the offenses were committed in association with, at the direction of, or for the benefit of a gang. He describes the expert's testimony as "conjecture and surmise" and contends the mere fact that two or more gang members were involved does not prove the offense was committed in association with or for the benefit of a gang. The Attorney General contends the evidence was sufficient to show the commission of the assault was intended to assist in the criminal conduct of other gang members.

To prove the enhancement with respect to an offense, the prosecution must show that offense was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).) "The enhancement . . . requires proof that the defendant commit a gang-related crime in the first prong—i.e., that the defendant be convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang. [Citation.] There is no further requirement that the defendant act with the specific intent to promote, further, or assist a *gang*; the statute requires only the specific intent to promote, further, or assist criminal conduct by *gang members*." (*People v. Albillar* (2010) 51 Cal.4th 47, 67.)

When presented with the facts of a hypothetical assault similar to the facts alleged in the instant assault, Deputy Mull opined that the offense would be committed for the benefit of the gang. He testified that the act would instill fear in others and demonstrate the gang members' allegiance to each other. He further testified that gang members'

willingness to commit crimes enhances the reputation of the gang as well as the reputation of the members who commit the crimes. He added that when the gang commits an act of violence, the enhanced reputation for violence "speaks loudly" to members of the community. This testimony constituted sufficient evidence from which the jury could reasonably infer the offense was committed for the benefit of the Norteño gang. Furthermore, the evidence was sufficient to show that defendants acted in concert with each other in conducting the assault. The jury could infer that Lanford lured Delgadillo outside for the purpose of assisting Garcia and Pettie in the ambush, all in retribution for the act of calling the police. Thus, the jury could reasonably infer that defendants acted with the intent to further or assist criminal conduct by fellow gang members.

Defendants rely on the testimony of their own gang expert, who opined under certain hypothetical circumstances that the offense would not have been committed for the benefit of the gang. In assessing the sufficiency of evidence on appeal, however, the reviewing court does not weigh the credibility of dueling experts. " 'Generally, "doubts about the credibility of [an] in-court witness should be left for the jury's resolution." ' [Citation.] 'Except in . . . rare instances of demonstrable falsity, doubts about the credibility of the in-court witness should be left for the jury's resolution.' [Citation.]" (*People v. Hovarter* (2008) 44 Cal.4th 983, 996.)

For the reasons above, we conclude the prosecution presented sufficient evidence to prove the existence of a criminal street gang and the remaining elements required by section 186.22.[7] Accordingly, these claims are without merit.

C. *Sufficiency of the Evidence Supporting the Convictions for Attempted Murder*

Lanford and Pettie contend the evidence was insufficient to support their convictions for attempted murder. The Attorney General contends the prosecution

---

**[7] The evidence was sufficient even without the testimonial hearsay that should have been excluded for the reasons set forth in section II.F below.**

presented substantial evidence from which a reasonable jury could have found them guilty under theories or aiding and abetting or natural and probable consequences. We conclude the evidence was sufficient to support the convictions for attempted murder.

1. *Legal Principles*

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. [Citations.] To be guilty of a crime as an aider and abettor, a person must 'aid[ ] the [direct] perpetrator by acts or encourage[ ] him [or her] by words or gestures.' [Citations.]" (*People v. Lee* (2003) 31 Cal.4th 613, 623.) Under a direct theory of aiding and abetting, "the person must give such aid or encouragement 'with knowledge of the criminal purpose of the [direct] perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of,' the crime in question. [Citations.] When the crime at issue requires a specific intent, in order to be guilty as an aider and abettor the person 'must share the specific intent of the [direct] perpetrator,' that is to say, the person must 'know[] the full extent of the [direct] perpetrator's criminal purpose and [must] give[ ] aid or encouragement with the intent or purpose of facilitating the [direct] perpetrator's commission of the crime.' [Citation.] Thus, to be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill. [Citation.]" (*Id.* at p. 624.)

An aider and abettor may also be indirectly liable under the theory of natural and probable consequences. " 'A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was

27

*reasonably* foreseeable.  [Citation.]'  [Citation.]  Liability under the natural and probable consequences doctrine 'is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted.'  [Citation.]  '[A]lthough variations in phrasing are found in decisions addressing the doctrine—'probable and natural,' 'natural and reasonable,' and 'reasonably foreseeable'—the ultimate factual question is one of foreseeability.'  [Citation.]  Thus, ' "[a] natural and probable consequence is a foreseeable consequence". . . .'  [Citation.]  But 'to be reasonably foreseeable "[t]he consequence need not have been a strong probability; a possible consequence which might reasonably have been contemplated is enough . . . ." [Citation.]'  [Citation.]  A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case [citation] and is a factual issue to be resolved by the jury. [Citation.]"  (*People v. Medina* (2009) 46 Cal.4th 913, 920 (*Medina*).)

2.  *The Evidence Was Sufficient to Support Convictions for Attempted Murder*

The prosecution argued that Garcia attempted to murder Delgadillo.  The prosecution presented evidence that Garcia pointed a gun at Delgadillo's face and fired multiple shots after Delgadillo fled.  A jury could reasonably infer from this evidence that Garcia harbored an intent to kill and took a "direct but ineffectual act" to accomplish the killing.  The record holds no evidence, however, that Lanford or Pettie fired gunshots at Delgadillo.  Nor did the prosecution argue that the "beat down" part of the assault—the beating of Delgadillo prior to the shooting—constituted attempted murder.  As to Lanford and Pettie, the prosecution's main theory was that the attempted murder was a natural and probable consequence of the assault and dissuasion offenses.  The trial court also instructed the jury on aiding and abetting.  A reasonable jury could have found sufficient evidence to convict Lanford and Pettie under either theory.

According to Deputy Mull's recounting of Delgadillo's statements, Delgadillo was at his cousin's house watching football when Lanford began asking Delgadillo about

28

calling the police on Garcia. Lanford then went briefly outside. When he returned, he invited Delgadillo back outside to smoke a cigarette. Lanford continued to question him about calling the police. When they got outside, Delgadillo saw Garcia, Pettie, and another man, whereupon Delgadillo was called a "cop caller" and the assault began. The jury could reasonably infer from this evidence that Lanford was coordinating the assault in advance when he briefly stepped outside, ensuring that Garcia and Pettie would be waiting for Delgadillo. The jury could also infer that defendants did so for the purpose of retaliating against Delgadillo and discouraging him from cooperating with law enforcement again in the future. Deputy Mull further testified that when gang members participate in such an assault, they expect and know that the attack could result in a murder. From this evidence, a reasonable jury could infer that attempted murder was a reasonably foreseeable consequence of the plan to assault and dissuade Delgadillo. (See *Medina, supra,* 46 Cal.4th at p. 922 [a rational trier of fact could have found that the shooting of the victim was a reasonably foreseeable consequence of gang assault].) A jury could also reasonably infer that Lanford and Pettie, by participating in the assault on Delgadillo, encouraged Garcia to fire gunshots with the intent to facilitate his commission of attempted murder.

For the reasons above, we conclude this claim is without merit.[8]

D. *Sufficiency of the Evidence Supporting the Convictions for Dissuasion*

Defendants contend the evidence was insufficient to support their convictions for dissuading a witness by force in Count 3 (§ 136.1, subd. (c)(1)) and dissuading a witness in furtherance of a conspiracy in Count 4 (§ 136.1, subd. (c)(2)). The Attorney General contends substantial evidence supported the convictions.

Section 136.1 prohibits, in part, any attempt to prevent or dissuade a witness to a crime from making a report of it to a police officer. (§ 136.1, subd. (b)(1).) As relevant

---

**[8] The evidence was sufficient even without the testimonial hearsay that should have been excluded for the reasons set forth in section II.F below.**

here, "witness" means "any natural person . . . having knowledge of the existence or nonexistence of facts relating to any crime" or "who would be believed by any reasonable person" to be such an individual. (§ 136, subd. (2).) Subdivision (c)(1) of section 136.1 punishes any person who knowingly and maliciously commits this offense by force or by an express *or implied* threat of force or violence. " 'There is, of course, no talismanic requirement that a defendant must say "Don't testify" or words tantamount thereto, in order to commit the charged offenses. As long as his words or actions support the inference that he . . . attempted by threat of force to induce a person to withhold testimony [citation], a defendant is properly' convicted of a violation of section 136.1, subdivision (c)(1)." (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1344, quoting *People v. Thomas* (1978) 83 Cal.App.3d 511, 514.) Subdivision (c)(2) punishes any person who knowingly and maliciously commits the offense in furtherance of a conspiracy.[9]

Defendants point out that the record holds no evidence that law enforcement was conducting any ongoing or pending child abuse case against Garcia at the time of the assault on Delgadillo. Defendants contend the only evidence of an attempt by Delgadillo to report to the police had already happened, such that the evidence could only show defendants were punishing him for making a past report. But given the evidence that Lanford questioned Delgadillo about calling the police and the evidence he was called a "cop caller" just before the attack, a jury could reasonably infer defendants were attempting to prevent him from making *future* reports to the police. Section 136.1 punishes the mere attempt to dissuade; the prosecution was not required to show the existence of an ongoing proceeding, nor that defendants successfully prevented any such efforts. Proof of an attempt to prevent any future report to the police was sufficient to satisfy the statute. (See *People v. Wahidi* (2013) 222 Cal.App.4th 802, 806 [if the

---

[9] **Section 136.1 prohibits other forms of dissuasion as well, but the trial court did not instruct the jury on them.**

30

defendant's actions or statements are ambiguous, but reasonably may be interpreted as intending to achieve the future consequence of dissuading the witness from testifying, the offense has been committed]; *People v. Mendoza, supra,* 59 Cal.App.4th at pp. 1344-1345 [the defendant's words not only expressed dissatisfaction with witness's past testimony but also attempted to dissuade her from giving any further testimony in the future].)  Similarly, Garcia contends he could not have intended to prevent Delgadillo from making future reports because Delgadillo had already called the police, but a jury could reasonably infer defendants intended to prevent him from making any additional reports.  We conclude defendants' convictions on Counts 3 and 4 were supported by substantial evidence.

Defendants further contend the evidence was insufficient to prove they made "discrete felonious threats."  Relying on *People v. Anaya* (2013) 221 Cal.App.4th 252 (*Anaya*), defendants contend substantial evidence of discrete felonious threats was required to support imposition of a life term under section 186.22, subdivision (b)(4)(C) (subdivision (b)(4)(C)).  That subdivision imposes a term of seven years to life for extortion or for "threats to victims and witnesses, as defined in Section 136.1" when the offense is committed for the benefit of a criminal street gang.  (§ 186.22, subd. (b)(4)(C).)

In *Anaya*, the defendants were convicted of, among other things, extortion under section 518 and dissuading a witness under subdivision (b)(1) of section 136.1.  The jury also found the offenses were committed for the benefit of a gang.  The trial court imposed life terms on both counts based on subdivision (b)(4)(C).  As to the dissuasion count, however, the prosecution did not allege, and the jury did not find, that the offense involved any express or implied threat of force.  The court expressly noted that the defendants were not convicted under subdivision (c)(1) of section 136.1.  (*Anaya, supra,* 221 Cal.App.4th at p. 271.)  Because the offense did not involve "threats to victims and witnesses" as required by subdivision (b)(4)(C), the court of appeal held the trial court erred by imposing the enhanced term.  (*Anaya, supra,* 221 Cal.App.4th at p. 271.)

31

The court of appeal then turned to the term imposed for the extortion count. The court noted that the conviction for extortion under section 518 required the jury to find "the use of force *or* fear induced by threat." (*Anaya, supra,* 221 Cal.App.4th at p. 272.) The court further noted that the subdivision (b)(4)(C) life term applies to extortion under section 519, which defines fear induced by threat. From these observations, the court inferred that the Legislature intended for the subdivision (b)(4)(C) life term to apply when the offense involves a threat, but not when it involves a use of force absent any threat. The court rejected the Attorney General's argument that this would result in absurd results by punishing threats more harshly than the actual use of force. The court held that "reserving the seven year-to-life term for the crime of extortion that involves a threat comports with the Legislature's desire to punish that threat more harshly. The use of force only, on the other hand, could amount to nothing more than a battery. Therefore, we believe the Legislature intended extortion committed via a felonious threat to be treated more harshly than extortion by simple force." (*Id.* at p. 273.) Because the jury could have convicted the defendants of extortion based the use of force without a finding of fear induced by threat, the court vacated the enhanced sentence.

Defendants contend the same logic requires us to vacate the life terms imposed on Counts 3 and 4 under subdivision (b)(4)(C). As described above, the trial court imposed terms of seven years to life on both counts, but the court stayed the term as to Count 3. As to Count 4 (dissuasion in furtherance of a conspiracy), defendants are correct. The Attorney General concedes the point, and the concession is well taken. The conviction on Count 4 did not require the jury to make any finding of any "threats to victims and witnesses." And as a matter of law, the plain language referencing "threats" in subdivision (b)(4)(C) does not encompass those offenses defined under section 136.1 that do not include the element of threat. (*People v. Lopez* (2012) 208 Cal.App.4th 1049, 1065.) Accordingly, the sentence imposed on Count 4 must be vacated.

32

As to Count 3, *Anaya* is not squarely on point. In *Anaya*, the defendants were not convicted under subdivision (c)(1) of section 136.1. (*Anaya, supra,* 221 Cal.App.4th at p. 271.) Defendants here were convicted under that subdivision in Count 3. Subdivision (c)(1) expressly punishes dissuasion where "the act is accompanied by force or by an express or implied threat of force or violence . . . ." (§ 136.1, subd. (c)(1).) The trial court instructed the jury with CALCRIM No. 2623, requiring the jury to find that "the defendant used force or threatened either directly or indirectly to use force or violence on the person or property of a witness." Subdivision (b)(4)(C) imposes the life term if the offense constitutes "threats to victims and witnesses, as defined in Section 136.1." That phrase includes acts of force like the assault alleged here, particularly where the assault was accompanied by verbal utterances—e.g., "cop caller"—that referenced the victim's act of reporting to the police. Based on this evidence, the jury reasonably could have found that the use of force also constituted an implied threat of further force in the future. We conclude that substantial evidence would have supported a true finding under subdivision (b)(4)(C).[10]

Defendants further contend the life term under subdivision (b)(4)(C) was unauthorized because the prosecution did not adequately plead the requisite facts, the trial court did not instruct on those facts, and jury made no such findings of fact, violating the right to notice and a jury trial under *Apprendi v. New Jersey* (2000) 530 U.S. 466. Defendants also argue that the convictions on Count 4 must be stricken because they were based on the same conduct underlying Count 3. We do not reach these claims because we hold the convictions on Counts 3 and 4 must be reversed for the reasons set forth in section II.H below.

---

**[10] The evidence was sufficient even without the testimonial hearsay that should have been excluded for the reasons set forth in section II.F below.**

33

E. *Sufficiency of the Evidence Supporting Pettie's Convictions*

Pettie separately contends the evidence was insufficient to sustain convictions or true findings on any of the charges or allegations against him. He argues that the evidence shows only that he was present at the scene of the crime, and not that he engaged in any conduct that would make him liable for any of the charged offenses. In conjunction with this claim, he contends the trial court erred by failing to instruct the jury that a defendant's mere presence at the scene of a crime does not by itself make him an aider and abettor. The Attorney General contends substantial evidence showed Pettie was an active participant in the crime and that the trial court was not required to instruct the jury on mere presence. We conclude sufficient evidence supports the convictions, but we hold the trial court erred by failing to instruct the jury on mere presence.

1. *Legal Principles*

"Mere presence at the scene of a crime which does not itself assist its commission or mere knowledge that a crime is being committed and the failure to prevent it does not amount to aiding and abetting." (*In re Michael T.* (1978) 84 Cal.App.3d 907, 911; *Pinell v. Superior Court* (1965) 232 Cal.App.2d 284, 287.) "To be liable for a crime as an abettor, the accused must have instigated or advised the commission of the crime or have been present for the purpose of assisting the crime. He must share the criminal intent with which the crime was committed. Neither his mere presence at the scene of the crime nor his failure, through fear, to prevent a crime establishes, without more, that an accused was an abettor." (*People v. Boyd* (1990) 222 Cal.App.3d 541, 556-557, citing *People v. Durham* (1969) 70 Cal.2d 171, 181.) The trial court has a sua sponte duty to instruct the jury on this rule where the evidence is substantial enough to merit its consideration. (*People v. Boyd, supra,* 222 Cal.App.3d at p. 557, fn. 14.) A bracketed portion of CALCRIM No. 401 (aiding and abetting) encapsulates the rule as follows: "If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendant was an aider and

34

abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor."

2. *Background*

The trial court did not instruct the jury based on CALCRIM No. 401. As to aiding and abetting, the trial court instructed the jury based on CALCRIM No. 1400 (active participation in a criminal street gang) in relevant part as follows: "To prove that the defendant aided and abetted felonious criminal conduct by members of the gang the People must prove, one, a member of the gang committed the crime; two, the defendants knew that the gang member intended to commit the crime; three, before or during the commission of the crime the defendant intended to aid and abet the gang member in committing the crime; and, four, the defendant's words or conduct did, in fact, aid or abet the commission of the crime. Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to and does, in fact, aid, facilitate, promote, encourage or instigates the perpetrators commission of that crime." A bracketed portion of CALCRIM No. 1400 includes a "mere presence" instruction identical to that in CALCRIM No. 401, but the trial court did not give that part of the instruction either.

3. *Sufficient Evidence Supports Pettie's Convictions, But the Trial Court Erred by Failing to Instruct the Jury on Mere Presence*

With the exception of Count 6 (active participation in a criminal street gang), Pettie is correct that the prosecution presented no specific evidence of individual acts, words, or conduct by him that would make him liable for any of the substantive charges. Although Delgadillo told police he saw Pettie outside when Lanford lured Delgadillo out of the house, Delgadillo made no claim that Pettie ever said anything, struck any blows, possessed any weapons, or discharged any gun. Delgadillo's mother testified that Delgadillo told her Lanford and Garcia were there, but she expressly stated that Delgadillo did not name anyone else.

35

The Attorney General contends the evidence shows Pettie participated in the assault, but the Attorney General supports this assertion with only two citations to the record. First, he asserts that Delgadillo told Deputy Mull that all the men there, including Pettie, participated in the assault. The record does not support this assertion. According to Deputy Mull's testimony, he recounted Delgadillo's statement as follows: When Lanford took Delgadillo outside, Delgadillo "saw that there were three other subjects there present outside." When the prosecutor asked Deputy Mull if Delgadillo had said he recognized the men outside, Deputy Mull responded, "He gave me the names of those persons there." Deputy Mull never testified that Delgadillo said all of the men outside participated in the assault. After Deputy Mull finished describing Delgadillo's narrative of the attack, the prosecutor asked Deputy Mull if Delgadillo gave Deputy Mull "the names of the people who jumped him." Deputy Mull responded affirmatively and said, "[Delgadillo] told me they were Andrew Lanford, Vincent Pettie, Philip Garcia and another person he identified as Robert." This testimony does not support an inference beyond a reasonable doubt that Pettie specifically engaged in conduct or took some action that would constitute aiding and abetting. The phrase "the names of the people who jumped him"—which were the prosecutor's words, not Delgadillo's words—could reasonably be interpreted as a reference to the persons who were present at the assault. This interpretation is further supported by Deputy Mull's earlier testimony that Delgadillo gave him the names of "three other subjects there present outside."

Second, the Attorney General points to the fact that Delgadillo picked Pettie's photo out of a "six pack" photographic lineup. But there was no evidence that Delgadillo said anything specific about Pettie at the photographic lineup apart from identifying his photo.

Pettie persuasively argues that this evidence, viewed in isolation, was not strong evidence of his guilt. As set forth above in section II.B, however, the prosecution also presented sufficient evidence to show Pettie was an active participant in the Norteño

36

criminal street gang together with Garcia and Lanford. Furthermore, Deputy Mull opined that when a gang member is summoned by fellow gang members to administer a "beat down" on some victim, the summoned member is expected to assist in the assault, even to the point of committing murder. Deputy Mull also opined that if that gang member failed to support or assist in the assault, the member would probably have the same punishment visited upon himself. Based on this testimony, a jury could reasonably infer that Pettie was not merely present, but that he aided and abetted the assault, attempted murder, and witness dissuasion. We conclude substantial evidence supported his convictions on the offenses and allegations charged in Counts 1 through 5.[11]

Nonetheless, the overall evidence of Pettie's active participation in the assault was not overwhelming. As described above, the prosecution presented no evidence of any specific conduct by Pettie apart from his presence at the assault. As such, the record holds sufficient evidence from which a jury could reasonably infer that he was merely present. Accordingly, we hold that the trial court had a sua sponte duty to instruct the jury on mere presence, e.g. with the pertinent bracketed portion of CALCRIM No. 401. The court's failure to do so constituted instructional error.

The parties do not address the applicable standard of prejudice, and we are unaware of any case law squarely on point. Generally, a failure to instruct on the element of an offense constitutes federal constitutional error. Courts have held that failure to instruct on the requisite mental state for aiding and abetting liability—so-called "*Beeman* error"—constitutes federal constitutional error because it omits a required element. (*People v. Croy* (1985) 41 Cal.3d 1, 13-14, discussing *People v. Beeman* (1984) 35 Cal.3d 547, 560 [knowledge of perpetrator's intent and intent to aid and abet the offense are required elements of aiding and abetting].) In contrast, an inadequate instruction on natural and probable consequences liability does not necessarily constitute

---

[11] **The evidence was sufficient even without the testimonial hearsay that should have been excluded for the reasons set forth in section II.F below.**

federal constitutional error if it does not " 'withdraw an element from the jury's determination or otherwise interject an impermissible presumption into the deliberative process.' " (*People v. Prettyman* (1996) 14 Cal.4th 248, 272 [distinguishing *Beeman* error], quoting *People v. Cox* (1991) 53 Cal.3d 618, 669.) Arguably, failing to instruct on "mere presence" is analogous to omitting the actus reus of an offense, since the omitted instruction essentially requires to jury to find the defendant took some action or engaged in some conduct. However, in giving CALCRIM No. 1400, the court properly instructed the jury that it must find "[t]he defendant's words or conduct did in fact aid and abet the commission of the crime" to find him guilty of aiding and abetting. Thus, the court instructed the jury it must find defendants spoke some words or engaged in some conduct, but the instruction did not make clear that such conduct required more than merely being present. Viewing the instructions as whole, then, the omission of the "mere presence" instruction created ambiguity as to whether merely being present constituted "conduct" as referenced in CALCRIM No. 1400. " '[I]n reviewing an ambiguous instruction . . ., we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " (*Prettyman, supra,* 14 Cal.4th at p. 272, quoting *Estelle v. McGuire* (1991) 502 U.S. 62, 72.)

Applying this standard, we conclude it is reasonably likely the jury misapplied the instructions in a way that caused it to find Pettie guilty based solely on his mere presence at the scene of the assault, and not based on a finding that his words or actions actually aided and abetted the offense. As set forth above, the evidence of his active participation in the assault, although sufficient to sustain the convictions, was not strong. Given the prosecution's arguments, the jury's verdicts on the assault and dissuasion charges may have hinged on the inference that Pettie's status as a Norteño gang member motivated him to participate. Although such an inference would have been reasonable, the evidence to support it—consisting solely of the gang expert's testimony that gang members are obligated to participate in a gang-related assault—did not strongly compel such a finding.

38

We further note that, as set forth in section II.F below, some of the gang-related evidence was erroneously admitted in violation of Pettie's right to confrontation. Absent the erroneously admitted evidence, the case for Pettie's active participation beyond his mere presence was even weaker. For all these reasons, we conclude this error requires the reversal of Pettie's convictions on Counts 1 through 5.

F. *Introduction of Testimonial Hearsay by the Prosecution's Gang Expert*

Defendants contend the prosecution violated their Sixth Amendment rights to confrontation by introducing testimonial hearsay through the gang expert. The Attorney General contends the gang expert's testimony did not violate the Sixth Amendment, but that any error was harmless. Based on *Sanchez, supra,* 63 Cal.4th 665, we hold the introduction of testimonial hearsay violated defendants' rights to confrontation. We conclude this violation requires reversal as to all gang-related enhancements as well as the gang life term imposed on Counts 3 and 4. We further conclude the violation requires reversal of Pettie's convictions on Counts 1 through 5, but not as to Garcia and Lanford.

1. *Factual and Procedural Background*

In his written pretrial motion to bifurcate the gang-related charges and enhancements, Garcia identified numerous contacts between himself and the police as documented in various police reports. Most of those contacts did not involve Deputy Mull, and he did not author the reports. Garcia argued evidence of the incidents was irrelevant and prejudicial under Evidence Code section 352. Soon after Garcia filed his motion, the Fourth District Court of Appeal issued an opinion holding the introduction of out-of-court testimonial statements by a gang expert without the opportunity for cross-examination violated the Sixth Amendment under *Crawford, supra.*[12] Citing the newly filed opinion, Garcia then moved to exclude evidence of the police reports on Sixth

---

[12] *People v. Archuleta* (2014), formerly at 225 Cal.App.4th 527, review granted and further action deferred pending consideration of *Sanchez, supra,* on June 11, 2014, S218640, and review dismissed on September 21, 2016.

39

Amendment grounds, whereupon Pettie and Lanford joined in the motion with respect to police reports of contacts with them as well. The police reports themselves were not admitted into evidence and are not part of the appellate record.

The trial court interpreted the case law as applying *Crawford* to "out-of-court hearsay statements that are merely parroting the opinion of the expert." The court ruled that the Sixth Amendment did not otherwise bar the gang expert from introducing hearsay as a basis for supporting his opinions, as long as the hearsay did not "parrot" the expert's opinion. The court and the parties then reviewed a specific list of reported police contacts with defendants that the prosecution's gang expert intended to introduce to support his opinions. The trial court excluded some incidents as prejudicial under Evidence Code section 352, but the court admitted numerous hearsay statements from police reports describing officers' contacts with each defendant. The details of these contacts are set forth above in section I.A.6.

With the introduction of this evidence against Lanford at trial, the court gave the jury a limiting instruction as follows: "The expert is rendering opinions as to gang affiliations. One of the allegations in the complaint. Everything he's testifying to regarding these incidents where [Lanford] was contacted including the conviction is only coming in for the purposes of the basis of his opinion. You can't consider it for any other purpose, such as, the character of a particular defendant, okay, in this case, Mr. Lanford. [¶] It doesn't come in as character evidence. It doesn't come in for any other purpose other than the basis of the opinion because you're going to be asked to evaluate these opinions in deliberations. Okay? And an opinion is only as good as the reasons for it. Okay. So it's coming in as a reason or basis for an opinion but for no other purpose."

2. *Legal Principles*

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) The Confrontation Clause thereby bars

40

"admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Crawford, supra,* 541 U.S. at p. 37.) This bar applies only to testimonial statements; admission of nontestimonial statements, while subject to state law hearsay rules, does not violate the Confrontation Clause. (*Id.* at p. 53.)

*Crawford, supra,* bars the introduction of case-specific testimonial hearsay by a gang expert. "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the case is one in which a prosecution expert seeks to relate *testimonial hearsay*, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Sanchez, supra,* 63 Cal.4th at p. 686, fn. omitted.) This bar cannot be avoided with the usual limiting instruction. "Once we recognize that the jury must consider expert basis testimony for its truth in order to evaluate the expert's opinion, hearsay and confrontation problems cannot be avoided by giving a limiting instruction that such testimony should not be considered for its truth." (*Id.* at p. 684.)

3. *The Introduction of Gang Expert Testimony Reciting Case-Specific Facts Based on Testimonial Hearsay Statements Violated Defendants' Rights to Confrontation*

As set forth above in section I.A.6, the prosecution's gang expert, Deputy Mull, testified to numerous contacts between police officers and defendants based on police reports he did not author. The reports generally described defendants wearing gang-related clothing and associating with persons known to be gang members or associates. Detailed descriptions of the reports in the record show that many or most of the reports were made to document completed crimes such as assaults, intimidation, vehicle theft,

41

and firearms offenses. With the exception of two incidents in which Deputy Mull was personally involved, the prosecution did not make any other witnesses or officers available for cross-examination concerning these contacts. Deputy Mull testified that he relied on the reports of these contacts in forming his opinion that defendants were Norteño gang members and hence that the substantive offenses were committed for the benefit of the gang.

This evidence is indistinguishable from the type of expert testimony found to be inadmissible in *Sanchez, supra,* 63 Cal.4th at page 694. In *Sanchez*, the prosecution's gang expert testified to the contents of police reports describing five prior police contacts involving the defendant, among other things. (*Ibid.*) Similarly, Deputy Mull's testimony recited "case-specific facts from a narrative authored by an investigating officer" who was not made available for cross-examination. (*Ibid.*) *Sanchez* makes clear that such statements are testimonial under *Crawford*, and that the admission of this evidence violated defendants' rights under the Confrontation Clause.

The Attorney General contends the evidence was admissible because the trial court instructed the jury not to consider the testimony for its truth. This argument mischaracterizes the court's limiting instruction. The court did not instruct the jury not to consider Deputy Mull's hearsay testimony for the truth of the matters to which he testified. The court instructed the jury not to consider the testimony as character evidence or for any other purpose except as a basis for the expert's opinions. In any event, *Sanchez* makes clear that instructing the jury not to consider the testimony for its truth cannot avoid or cure the confrontation violation. (*Sanchez, supra,* 63 Cal.4th at p. 684.)

For the reasons above, we conclude the admission of testimonial hearsay statements by the prosecution's gang expert violated defendants' Sixth Amendment right to confrontation.

42

4. *Harmless Error*

A violation of the Sixth Amendment's confrontation right requires reversal of the judgment against a criminal defendant unless the prosecution can show beyond a reasonable doubt that the error did not contribute to the verdict obtained. (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Rutterschmidt* (2012) 55 Cal.4th 650, 661.) " ' "To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." [Citation.] Thus, the focus is on what the jury actually decided and whether the error might have tainted its decision. That is to say, the issue is "whether the . . . verdict actually rendered in this trial was surely unattributable to the error." [Citation.]' " (*People v. Pearson* (2013) 56 Cal.4th 393, 463 (*Pearson*).)

The Attorney General contends the error was harmless because Deputy Mull's opinions were "not based in significant part" on the prior contacts described in the police reports. The Attorney General points out that Deputy Mull also relied on other factors in forming his opinion, including his knowledge of the Norteño gang, his own training and experience, and various observations such as defendants' clothing, tattoos, and gang paraphernalia. Furthermore, as to Pettie and Lanford each, at least one of the contacts personally involved Deputy Mull, and thus his statements about those were not hearsay.

There is no support in the record for the assertion that Deputy Mull's opinions were not based in significant part on the contacts described in the police reports. This argument also misconstrues the *Chapman* standard. The question under *Chapman* is not whether the expert relied in significant part on the inadmissible evidence; the question is whether the admission of that evidence contributed to the verdict. Deputy Mull described several police contacts with each defendant, typically involving defendants' association with "known" gang members or associates. These included five contacts with Garcia, at least six contacts with Lanford not involving Deputy Mull, and nine contacts with Pettie not involving Deputy Mull. The Attorney General puts forth nothing showing that this

43

evidence did not contribute to the jury's findings on the gang enhancements. To the contrary, it appears likely the evidence contributed to the jury's findings.

Furthermore, the evidence of defendants' connections to the Norteño street gang was not so overwhelming that the police contacts were "unimportant in relation to everything else the jury considered on the issue . . . ." (*Pearson, supra,* 56 Cal.4th at p. 463.) Much of the evidence relied on by Deputy Mull consisted of red items of clothing, including sports memorabilia commonly worn by fans of the San Francisco 49ers football team or the San Francisco Giants baseball team. And much of the evidence that Deputy Mull characterized as gang-related had no specific connection to the Norteño gang per se, but instead related to cliques or neighborhoods. For example, Deputy Mull described some of the tattoos worn by defendants as associated with local gang cliques or neighborhoods. Pettie had two neighborhood-related tattoos—"Hollis," and "V.H.," which stood for Via Hermosa according to Deputy Mull. Similarly, Garcia had tattoos of "Eastside" and "E.S.S.J.," which represented East Side San Jose according to Deputy Mull. Deputy Mull testified that there were Norteño-identified cliques operating in these neighborhoods. But the prosecution's theory at trial—as well as the Attorney General's position on appeal—identified the broader Norteño gang itself as the criminal street gang for purposes of section 186.22. As the Attorney General acknowledges, Deputy Mull testified that all three defendants were members of the Norteño gang, *not one of the cliques.* The Attorney General expressly concedes that "although the three men had tattoos and other indicia pertaining to certain geographic-based 'clicks,' there was no definitive evidence that appellants belonged to different Norteño subgroups." And all the predicate offenses presented by the prosecution were committed by Norteño gang members, not members of any subset gang.

Under this theory, tattoos or clothing associated with cliques, neighborhoods, or subsets are not overwhelming evidence of active participation in the Norteño gang itself. Nor are they overwhelming evidence that the defendants committed offenses for that

44

gang's benefit. While a jury could reasonably find that tattoos relating to a Norteño-associated gang clique or subset tend to support the inference that a defendant is an active participant in the Norteño gang itself, or that the defendant committed the offense for the benefit of that gang, in this case the evidence to support such a finding was not overwhelming. This is particularly true in the absence of evidence that would establish an "organizational or associational connection" between the relevant cliques and the broader Norteño gang as required under *Prunty, supra*. Deputy Mull offered no such testimony with respect to the cliques at issue here.

We conclude the Attorney General has not shown beyond a reasonable doubt that the erroneously admitted evidence did not contribute to the jury's gang-related findings and verdicts. Accordingly, the error requires us to vacate defendants' sentences and vacate the true findings with respect to all gang-related enhancements, as well as the gang-related life term imposed on Counts 3 and 4 under section 186.22, subdivision (b)(4)(C).[13]

However, the erroneous admission of such gang expert testimony does not necessarily require reversal of the convictions on all the underlying substantive charges in Counts 1 through 5. In *Sanchez*, the defendant was convicted of possession of a firearm by a felon and possession of drugs while armed with a loaded firearm, in addition to the gang-related allegations. The high court reversed the gang enhancement findings, but declined to reverse the convictions on the underlying charges. The court concluded that, in the absence of the inadmissible hearsay, the evidence still showed Sanchez possessed the drugs and firearm. The court noted, "A drug dealer may possess drugs in saleable quantities, along with a firearm for protection, regardless of any gang affiliation, and without an intent to aid anyone but himself." (*Sanchez, supra,* 63 Cal.4th at p. 699.)

---

**[13] The error would also require reversal of the conviction on Count 6 (active participation in a criminal street gang under subdivision (a) of 186.22), but the prosecution dismissed that count at sentencing.**

As to Garcia and Lanford, the record holds abundant evidence of their guilt on the substantive offenses charged in Counts 1 through 5 apart from the gang expert's inadmissible hearsay testimony. First, Garcia had an obvious non-gang motive to assault and dissuade Delgadillo. Delgadillo had contacted the police concerning Garcia's alleged abuse of his daughter, and Delgadillo was engaged in a custody dispute with his ex-wife, who was Garcia's girlfriend. Second, according to Delgadillo's statements to the police, he specifically identified Garcia as the attacker who held the gun to his face just before he fled and heard the gunshots fired. As for Lanford, Delgadillo's statements to the police specifically identified Lanford as the one who lured him outside while questioning him about having called the police. Delgadillo's statements also revealed that Lanford briefly went outside and returned before the attack, suggesting he may have arranged for the other attackers to be present. Lanford was also related to Delgadillo through marriage to Delgadillo's cousin, and Lanford lived at the same location as Delgadillo's ex-wife. Furthermore, Deputy Mull's testimony recounting Delgadillo's statements was generally corroborated by Delgadillo's mother, who gave an account of Delgadillo's statements consistent with Deputy Mull's testimony. We conclude the record holds strong non-gang-related evidence of Garcia and Lanford's guilt as to the substantive offenses charged in Counts 1 through 5.[14] By the same token, strong evidence supported the true findings on the firearm enhancements and the infliction of great bodily injury. As to Garcia and Lanford then, we conclude the error was harmless beyond a reasonable doubt with respect to the substantive charges and non-gang enhancements.

The evidence pertaining to Pettie's role in the substantive offenses was substantially weaker. As discussed above in section II.E, the prosecution presented no

---

**[14] As noted above, however, the sentences on Counts 3 and 4 must be vacated because the court imposed the gang-related life term under subdivision (b)(4)(C) of section 186.22. And as to Lanford, the 20-year term imposed under section 12022.53, subsection (e)(1), must be vacated because it too requires a finding under section 186.22.**

46

evidence of any specific words, conduct, or action taken by Pettie beyond his mere presence at the scene of the assault. As to Pettie, the prosecution's theory of liability—that he aided and abetted the assault and dissuasion, or conspired with Lanford and Garcia to do so —hinged entirely on Pettie being a Norteño gang member. After Pettie's counsel argued in closing that the prosecution had presented no evidence of Pettie's participation in the assault, the prosecution argued on rebuttal that Pettie had a motive to "beat down" Delgadillo to back up fellow Norteño gang members. And as set forth in detail above, the prosecution's gang expert opined that gang members are obligated—indeed, compelled under threat of violence—to back up fellow gang members and participate in a "beat down" when summoned to do so. The prosecution presented no other evidence of Pettie's motive. The only non-gang connection between Pettie and Delgadillo consisted of the fact that the two had gone to school together. The record shows no familial connection between Pettie and Delgadillo. Moreover, Delgadillo's mother expressly testified that Delgadillo had identified Lanford and Garcia, and nobody else, as participating in the assault.

Based on this evidence, it is likely the jury relied on evidence of Pettie's membership in the Norteño gang to support its findings of guilt on the substantive offenses. For the same reason, the prosecution cannot show beyond a reasonable that the erroneously admitted testimony concerning Pettie's prior police contacts did not contribute to the verdicts on Counts 1 through 5. We conclude the error requires reversal of the convictions on those counts as to Pettie.

G. *The Gang Expert's Reliance on Hypothetical Fact Specific Scenarios*

In questioning Deputy Mull, the prosecution posed several questions based on hypothetical scenarios with facts substantially the same as the facts alleged in this case. Defendants contend the expert's opinions based on those hypothetical scenarios were "unduly exhaustive case-mirroring opinions" admitted in violation of defendants' rights to due process, a fair trial, and the right to trial by jury. Defendants concede state law

permits the use of such hypotheticals, but they present the claim to exhaust their remedies.

The concession is well taken. A prosecutor may present a gang expert's opinions through hypothetical questions as long as the questions are rooted in facts shown by the evidence. (*People v. Vang* (2011) 52 Cal.4th 1038, 1045.) A gang expert presented with such hypothetical facts may opine that the offense was committed for the benefit of a criminal street gang. Our high court specifically rejected the contention that expert testimony based on hypothetical facts, when "thinly disguised" to resemble the defendant's circumstances, is inadmissible testimony. (*Id.* at p. 1041.) The hypothetical scenarios presented in the questions posed here closely matched the facts of the offenses as supported by the evidence, and were therefore permissible under *Vang*. We conclude this claim is without merit.

H. *The Failure to Instruct the Jury on the Mens Rea Required for Witness Dissuasion*

Defendants contend the trial court failed to instruct the jury with respect to Counts 3 and 4 on the state of mind required for witness dissuasion. The Attorney General concedes the error but contends it was harmless. We conclude the error was not harmless beyond a reasonable doubt, requiring reversal of the convictions on Counts 3 and 4.

The prosecution charged defendants with attempting to dissuade a witness by force or threat in Count 3 (§ 136.1, subd. (c)(1)) and attempting to dissuade a witness in furtherance of a conspiracy in Count 4 (§ 136.1, subd. (c)(2)). These are specific intent crimes. (*People v. Young* (2005) 34 Cal.4th 1149, 1210; *People v. Brenner* (1992) 5 Cal.App.4th 335, 339.) "Unless the defendant's acts or statements are intended to affect or influence a potential witness's or victim's testimony or acts, no crime has been committed under this section." (*People v. McDaniel* (1994) 22 Cal.App.4th 278, 284.) Here, the prosecution was required to prove that defendants intended to prevent or discourage Delgadillo from reporting a crime to law enforcement.

48

"A trial court bears a sua sponte duty to instruct the jury on the essential elements of an offense . . . ." (*People v. Bell* (2009) 179 Cal.App.4th 428, 434, citing *People v. Flood* (1998) 18 Cal.4th 470, 504.) As the Attorney General concedes, the trial court failed to instruct the jury on the required specific intent as to Counts 3 and 4.[15] The failure to instruct the jury on an element of the offense is subject to harmless error analysis under *Chapman, supra,* 386 U.S. 18, 26 [the prosecution has the burden to show beyond a reasonable doubt that the error did not contribute to the verdicts].)

Defendants contend the error requires reversal because the evidence did not conclusively establish they intended to prevent or discourage Delgadillo from making police reports *in the future*. They acknowledge the evidence that someone called Delgadillo a "cop caller" and that Lanford questioned him about calling the police just before the assault. But defendants contend this evidence showed at most that they intended to exact retribution or revenge for Delgadillo's *past report to the police*.

To support this argument, defendants rely on *People v. Ford* (1983) 145 Cal.App.3d 985 (*Ford*). Ford was a defendant at a preliminary hearing when he threatened a witness who had just testified against him. Ford yelled, "You punk mother fucker, we'll get you, you've got kids." (*Id.* at p. 987.) Ford was convicted under subdivision (c)(1) of section 136.1, but the trial court failed to instruct the jury on the required specific intent. The court of appeal found the evidence sufficient to sustain the conviction but reversed based on the instructional error. The court noted the ambiguous nature of the threat, which could have been interpreted "as a simple angry statement of impending revenge: 'You did this to me and you will pay for it.' " (*Ford, supra,* at pp. 989-990.) The court held, "If this is the proper interpretation, the crime was not

_____

[15] **The Attorney General also concedes the court failed to instruct the jury that it must find Delgadillo was a crime witness. Defendants, however, do not claim this omission by itself requires reversal. In any event, we would find it harmless beyond a reasonable doubt, as the evidence on this point was undisputed.**

committed." (*Ibid.*) Based on this ambiguity, the court held the instructional error was not harmless. Defendants contend the same logic applies here.

The Attorney General contends the facts here more closely resemble those of *People v. Brenner* (1992) 5 Cal.App.4th 335 (*Brenner*) and *People v. Jones* (1998) 67 Cal.App.4th 724 (*Jones*). In *Brenner*, Brenner and several men attacked the victim in a hotel room and took cash from him. After taking the cash, Brenner told the victim not to call the police and threatened to kill him if he did so. Brenner was convicted under subdivision (c)(1) of section 136.1. He argued on appeal that the trial court failed to instruct the jury on the required specific intent for the offense. The court of appeal agreed that the omission constituted instructional error, but the court found the error harmless and affirmed the conviction. The court distinguished *Ford* on the ground that Brenner's statement was "absolutely unambiguous as to its intent" to dissuade the victim from reporting to the police. (*Brenner, supra,* 5 Cal.App.4th at p. 339.)

In *Jones, supra,* 67 Cal.App.4th 724, Jones repeatedly phoned a witness named Darrell Conedy and said, "Are you going to testify? Don't testify." (*Id.* at p. 726.) When Conedy asked Jones what he would do about it, Jones responded, "I'll do whatever I have to. Just don't testify, man. I'm telling you, Darrell, I'll do whatever I have to, man." (*Ibid.*) Jones was convicted under subdivision (c)(1) of section 136.1, but the trial court failed to instruct on the requisite specific intent. The court of appeal held the omission was instructional error but found it harmless. After comparing the facts of *Ford* and *Brenner*, the court concluded Jones' case was more similar to *Brenner*. The court found there was "nothing ambiguous" about Jones' statements and concluded that they demonstrated "an explicit intent to dissuade." (*Jones, supra,* at p. 728.)

The Attorney General acknowledges that defendants here made no explicit or unambiguous statements to the effect of "don't call the police" or "we'll assault you again if you call the police." As discussed above in section II.D, we agree that a jury could reasonably infer from defendants' conduct that they intended to dissuade

Delgadillo from calling the police in the future, such that sufficient evidence supported the convictions on Counts 3 and 4. But *Chapman* requires the Attorney General to show beyond a reasonable doubt that the error did not contribute to the verdicts. We do not find defendants' conduct so unambiguous that it demonstrated an intent to dissuade future reports. Defendants' statements and actions more closely resemble those in *Ford* than those in *Brenner* and *Jones*.

The Attorney General points to defendants' nonverbal conduct. He argues that Garcia fired multiple gunshots at Delgadillo as he ran away, thereby sending "an unmistakable 'parting message' " intended to dissuade him from making future reports. But this "parting message" theory cannot be squared with the prosecution's theory of the case—that defendants attempted to *murder* Delgadillo by firing the gun at him. At the close of evidence, defendants moved for judgments of acquittal under section 1118.1. The trial court ruled that the evidence pertaining to the "beat down" portion of the assault was insufficient to support charges of attempted murder. Accordingly, the prosecution specifically argued that the firing of the gun constituted the actus reus of the attempted murder. Having found defendants guilty of that charge, the jury must have found the shooting was intended to kill Delgadillo. This contradicts the Attorney General's argument that the shooting was intended as a "parting message" to discourage future police reports.

Of course, the law generally accepts inconsistent verdicts. (*People v. Palmer* (2001) 24 Cal.4th 856, 860.) And section 136.1 prohibits "attempts to *prevent* or dissuade" a witness from making reports. (§ 136.1, subd. (b).) Murder is one way to prevent a witness from doing so. (See, e.g., *People v. Townsel* (2016) 63 Cal.4th 25, 42.) But a defendant can also murder a witness solely for revenge, and here the evidence of defendants' intent does not compel a contrary finding beyond a reasonable doubt. We

51

conclude the Attorney General has not shown harmless error under *Chapman*. We will reverse the convictions on Counts 3 and 4.[16]

I. *Alleged Brady Violation*

Defendants contend the prosecution violated *Brady, supra,* by failing to disclose several prior convictions suffered by Patricia Torres. The Attorney General contends evidence of the offenses was inadmissible and immaterial. We conclude defendants have not shown that evidence of Patricia's prior offenses was material under *Brady*.

1. *Background*

Patricia (Delgadillo's mother) did not appear on the prosecution's pretrial witness list. She was present in the courtroom when Delgadillo testified, but she left in the middle of his testimony because she did not believe he was testifying truthfully. The prosecution's investigator then interviewed Patricia, who revealed that Delgadillo had made statements to her about the assault. Shortly thereafter, the prosecution called her as a witness. Defendants objected based on the absence of notice and discovery, but the trial court allowed her to testify.

As set forth in section I.A.4 above, Patricia testified that Delgadillo called her on the night of the assault and told her about the attack. She recounted his statement in her testimony. Delgadillo later came home with a knot on his head and told Patricia he had been hit with a gun. Her testimony partly corroborated Delgadillo's account of the attack as told to Deputy Mull, inculpating Lanford and Garcia.

After trial, defendants moved for a new trial based on, among other things, the prosecution's failure to disclose Patricia's criminal record. At a hearing on the matter, the prosecutor admitted he had not searched for her criminal record, but he pointed out that he had not intended to call her as a witness, and he described the omission as unintentional. The prosecution then disclosed that Patricia had suffered three prior

---

**[16] Because we are reversing the convictions on these counts, we do not reach defendants' remaining claims concerning Counts 3 and 4.**

misdemeanor convictions. In 2005, she was convicted of driving under the influence. In 1991, she was convicted of drawing a check on an account with insufficient funds. In 1992, she was convicted of forgery. The trial court, ruling that the prosecution had not violated *Brady*, denied defendants' motion.

### 2. *Legal Principles*

"Under *Brady,* [citation], and its progeny, the prosecution has a constitutional duty to disclose to the defense material exculpatory evidence, including potential impeaching evidence." (*People v. Superior Court (Johnson)* (2015) 61 Cal.4th 696, 709.) "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." (*Strickler v. Greene* (1999) 527 U.S. 263, 281-282.) "Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt and innocence.' " (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043 (*Salazar*), quoting *United States v. Agurs* (1976) 427 U.S. 97, 112, fn. 20.) "Evidence would have been *favorable* if it would have helped the defendant or hurt the prosecution, as by impeaching one of its witnesses. Evidence would have been *material* only if there is a reasonable probability that, had it been disclosed to the defense, the result would have been different. The requisite *reasonable probability* is a probability sufficient to undermine confidence in the outcome on the part of the reviewing court. It is a probability assessed by considering the evidence in question under the totality of the relevant circumstances and not in isolation or in the abstract." (*People v. Dickey* (2005) 35 Cal.4th 884, 907-908.)

### 3. *The Failure to Disclose Patricia Torres' Criminal Record Was Immaterial*

The Attorney General does not dispute that the evidence of Patricia's prior convictions was favorable to defendants for *Brady* purposes. And although the Attorney General asserts that the failure to disclose was inadvertent, he acknowledges that a *Brady*

53

violation does not depend on the prosecutor's intentions. We conclude defendants have satisfied the first two prongs under *Brady*, and we turn to the materiality analysis.

The Attorney General contends evidence of Patricia's prior offenses was immaterial because the evidence was likely inadmissible. Under *People v. Wheeler* (1992) 4 Cal.4th 284, evidence of past misdemeanor conduct relevant to a witness's credibility is admissible subject to the trial court's discretion. (*Id.* at p. 295.) Under Evidence Code section 352, courts should "consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*Wheeler, supra,* at pp. 296-297.) The Attorney General points to the remoteness of Patricia's first two offenses—both of which occurred in the early 1990s—as indications that the trial court likely would have excluded them. (See *People v. Beagle* (1972) 6 Cal.3d 441, 453 [remoteness of the prior conviction is a factor in admissibility], abrogated on other grounds by *People v. Diaz* (2015) 60 Cal.4th 1176.) The Attorney General also asserts that, even if evidence of the conduct was admissible, it was immaterial because Patricia was not a central witness in the prosecution's case, and the evidence of her prior conduct had little probative value.

Defendants describe Patricia as "one of the most important witnesses in the trial," and they characterize her testimony as critical to the prosecution's case. We are not persuaded. While she provided corroboration for some of Delgadillo's statements to police, she was secondary to the prosecution's case; the prosecution could have proven all the charges without her beyond a reasonable doubt. This weighs against a finding of materiality. " 'In general, impeachment evidence has been found to be material where the witness at issue "supplied the only evidence linking the defendant(s) to the crime" [citations], or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case [citation].' " (*Salazar, supra,* 35 Cal.4th at p. 1050.) Furthermore, the evidence of her past conduct was remote in time, and her offenses were not particularly serious. (See *People v. Letner* (2010)

54

50 Cal.4th 99, 177 [failure to disclose offenses was immaterial where none of the charges against the witness was serious].)

On balance, we find the Attorney General's position persuasive. Even assuming evidence of Patricia's past offenses was admissible, defendants have not shown a reasonable probability of a different result if it had been admitted. We conclude defendants' *Brady* claim fails because the nondisclosure of Patricia's prior convictions was immaterial.

## J. *Prosecutorial Misconduct*

Defendants contend the prosecution committed misconduct by disparaging defendants and their counsel, and by vouching for prosecution witnesses. The Attorney General contends defendants forfeited these claims by failing to object and argues that none of the identified incidents constituted misconduct. We find no merit to defendants' contentions.

### 1. *Legal Principles*

When prosecutorial misconduct "infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated." (*People v. Panah* (2005) 35 Cal.4th 395, 462 (*Panah*).) A prosecutor's conduct at trial may also constitute misconduct under state law if it involves the use of "deceptive or reprehensible methods to persuade the trial court or the jury." (*Ibid.*) " '[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Ayala* (2000) 23 Cal.4th 225, 284, quoting *People v. Ochoa* (1998) 19 Cal.4th 353, 427.)

"To preserve a claim of prosecutorial misconduct for appeal, a criminal defendant must make a timely objection, make known the basis of his objection, and ask the trial court to admonish the jury." (*People v. Brown* (2003) 31 Cal.4th 518, 553.) There are two exceptions to forfeiture: (1) the objection or the request for an admonition would

have been futile; or (2) the admonition would have been insufficient to cure the harm occasioned by the misconduct. (*Panah, supra,* 35 Cal.4th at p. 462.) A defendant claiming one of these exceptions must find support for it in the record. (*Ibid.*)

2. *The Prosecution Did Not Commit Prosecutorial Misconduct*

Defendants identify several statements the prosecutor made in closing argument as examples of purported misconduct. As an initial matter, the Attorney General is correct that defendants failed to object to any of the identified statements. Moreover, defendants do not point to any support in the record to show that objections or admonitions would have been futile. We conclude defendants have forfeited these claims.

In any event, defendants have not shown any reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. Defendants assert that the prosecutor "sought to drive home the case that this case was to be judged, above all else, as a gang case." Given that defendants' alleged loyalty to the gang was central to the prosecution's theory of the case, and given that defendants were charged with gang offenses and enhancements, there was nothing improper about the prosecution's focus on gang-related evidence.

Defendants contend the prosecution repeatedly denigrated defense counsel. At one point, the prosecutor told the jury, "I do not underestimate you. Never have. I think the defense does or will." At another point, the prosecutor stated, "The defense thinks, [Delgadillo] didn't testify; we're golden." In its rebuttal, the prosecution complained about one of defense counsel's objections, stating, "And it's frustrating, to say the least, when a defense attorney objects to something I'm saying . . . ." The prosecutor then repeated his assertion that defense counsel was underestimating the jury, and he described Lanford's counsel as smirking and showing disdain for Patricia Torres' testimony. While the prosecutor's behavior was not exemplary, we do not find that these statements "infect[ed] the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process," nor that the statements constituted

56

"deceptive or reprehensible methods" likely to be applied by the jury in an objectionable fashion. (*Panah, supra,* 35 Cal.4th at p. 462.)

Finally, defendants contend the prosecution improperly vouched for its witnesses. "Impermissible 'vouching' may occur where the prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony." (*People v. Fierro* (1991) 1 Cal.4th 173, 211, overruled on another ground in *People v. Thomas* (2012) 54 Cal.4th 908, 941.) "No impermissible 'vouching' occurs where 'the prosecutor properly relie[s] on facts of record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief.' " (*Williams, supra,* 16 Cal.4th at 257, quoting *People v. Medina* (1995) 11 Cal.4th 694, 757.)

Defendants allege several statements constituted vouching. In closing argument, the prosecutor described Patricia Torres as a "brave little lady" who took the stand and "told you what was going on, as if you all didn't already know." The prosecutor also described Deputy Mull as someone who "knew [the] individuals involved." The prosecutor later told the jury that "you're able to evaluate the evidence . . . and the credibility of Deputy Mull, both as investigator, both as to what he heard, what he testified to that actually happen that night including the unequivocal identification of those three defendants; as well as a gang expert . . . ." None of these statements constituted improper vouching. Describing Patricia as "brave" did not constitute an assurance of her veracity, and the prosecution's descriptions of Deputy Mull's testimony were based on the record or reasonable inferences therefrom.

For the reasons above, we find these claims without merit.

K. *The Denial of Defendants' Motions for a New Trial*

Defendants contend the trial court erroneously denied their motions for a new trial based on, among other things, juror bias resulting from the jury's exposure to outside influences. Defendants also contend their attorneys provided ineffective assistance of

counsel by failing to seek jury admonishments regarding the presence of extra security. The Attorney General responds that the trial court adequately investigated any potential juror bias and found no evidence of bias or misconduct. As to ineffective assistance of counsel, the Attorney General contends trial counsels' decisions were likely tactical, and that defendants cannot show prejudice.

We conclude the trial court did not err in denying defendants' motion for a new trial, and we find defendants suffered no ineffective assistance of counsel for failing to request admonishments.

1. *Background*

After trial, defendants moved for a new trial on several grounds including insufficient evidence, the alleged *Brady* violation concerning Patricia Torres, alleged prosecutorial misconduct, and the jury's exposure to outside influences. In this section, we consider the asserted jury bias and related claims.[17]

After the prosecution's closing argument, the trial court informed the parties that four jurors had approached the bailiff at the end of the day and expressed concern about persons in the audience having intimidating facial expressions. One of those jurors— Alternate Juror No. 1—wrote the following note to the court: "Your Honor[,] Does it hinder the legal process if when we return (the jury members) to the jury room—but before we deliberate our opinions—we ask if any jury members want to be released from the jury. I believe that some members are being influenced outside the court by attendees of the court and want to make sure the case gets judged on the merits of the facts presented, and not emotion or fear." (Underline in original.)

---

**[17] We find no merit in defendants' claims of insufficient evidence, the *Brady* violation, and prosecutorial misconduct for the reasons set forth above. To the extent defendants presented these claims below as grounds for the new trial motion, we conclude the court did not err in denying the motion on those grounds.**

The court instructed the sheriff's department to monitor the audience and brought Alternate Juror No. 1 into court with all parties present. Alternate Juror No. 1 told the court that, during jury selection, she was crossing the street with four or five other jurors at the end of the day when a vehicle driven by an unidentified female approached them and slowed down. The driver made a gesture with two fingers, pointing at her own eyes and then pointing at the juror. Alternate Juror No. 1 said she assumed the driver was annoyed because the juror had not seen the vehicle approaching, and that it had nothing to do with the case. The court asked the juror if she could continue with that assumption, and the juror stated she could. The court instructed her to put the incident aside, as well as any conversations she may have had with other jurors about it. The court further instructed the juror to judge the case on its merits without holding anything against defendants or assuming they had any involvement in the incident. The juror stated that she could do so.

Alternate Juror No. 1 also stated that she had talked to another juror who had experienced something similar, and that there was a third juror involved in this conversation. The court then instructed Alternate Juror No. 1 to tell the bailiff which of the other jurors were involved. After the juror left, the court asked defendants' counsel if they had any concerns about the court's examination of the juror, and all three attorneys responded that they had no concerns. The court then stated that it would instruct the sheriff's department to accompany jurors to their cars after lunch and evening recesses.

The court then brought Juror No. 3 into court. Juror No. 3 told the court that she had been in the parking lot after a lunch recess when she saw two persons in a vehicle "just sort of staring me down." She stated that she felt intimidated "[t]o a degree . . . ." The court instructed her not to hold the incident against defendants and to base her judgment on the facts and the law without regard to any external incidents. The court asked the juror if she felt she could set aside the incident and judge the case on its merits, and she responded affirmatively. The court then asked her to identify the other jurors

59

with whom she had discussed the matter, whereupon she did so. She added that she had felt better because she had seen members of the sheriff's office in the parking lot that morning.

The court then brought Juror No. 1 into court. Juror No. 1 told the court she had heard other statements from jurors about possible intimidation. During jury selection, another juror said someone in the audience had referred to Juror No. 1 as "a mean lady." Juror No. 1 did not know whether the person in the audience was associated with defendants. She affirmed to the court that she could judge the case based solely on the merits and put aside any feelings that might result from this comment. Juror No. 1 also stated that she had heard two other conversations in which jurors expressed nervousness, but she could not describe or recall any details of what she had heard. Juror No. 1 affirmed that she would set aside what she had heard and that it would not impact her ability to judge the case on its merits.

Finally, the court brought Juror No. 8 into court. She told the court she had heard a conversation in which other jurors had expressed concerns, but she added that she did not say anything or get involved in the conversation. She stated that she had not experienced any of the things the other jurors had discussed. Juror No. 8 affirmed to the court that she could judge the case based solely on the merits and without regard for any external influences. She reaffirmed that she would "[a]bsolutely" be able to perform her duties as a juror without regard to any biases, fears, or concerns she might have.

After Juror No. 8 left, the court again asked counsel if they wished to raise any concerns. Counsel for Lanford and Pettie stated they had no concerns. Counsel for Garcia stated that she was only concerned about whether the court had identified and questioned all the jurors involved. The court asked if counsel for Garcia wanted all the jurors brought into court for questioning, but she stated twice that she did not want the court to do so. Counsel expressed her belief that nothing had impacted the jurors.

60

Finally, the prosecutor corroborated the observation of Juror No. 3 that additional law enforcement officers had been present in the parking lot that morning. The prosecutor stated that the sergeant in charge of courthouse security was putting into place additional measures, including escorting jurors to their cars.

2. *Legal Principles*

Criminal defendants have a constitutional right to trial by unbiased, impartial jurors. (U.S. Const., 6th & 14th Amends; Cal. Const., art. I, § 16; *Irvin v. Dowd* (1961) 366 U.S. 717, 722, superseded on other grounds by statute; *People v. Nesler* (1997) 16 Cal.4th 561, 578 (*Nesler*).) An impartial jury is one in which no juror has been improperly influenced, and every juror is capable and willing to decide the case based solely on the evidence. (*In re Hamilton* (1999) 20 Cal.4th 273, 294 (*Hamilton*).) "Juror bias does not require that a juror bear animosity towards the defendant. Rather, juror bias exists if there is a substantial likelihood that a juror's verdict was based on an improper outside influence, rather than on the evidence and instructions presented at trial, and the nature of the influence was detrimental to the defendant." (*People v. Cissna* (2010) 182 Cal.App.4th 1105, 1116.) "A sitting juror's involuntary exposure to events outside the trial evidence . . . may require . . . examination for probable prejudice. Such situations may include attempts by nonjurors to tamper with the jury, as by bribery or intimidation." (*Hamilton, supra,* 20 Cal.4th at pp. 294-295.) "Because a defendant charged with crime has a right to the unanimous verdict of 12 impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced." (*People v. Pierce* (1979) 24 Cal.3d 199, 208.)

"[A] nonjuror's tampering contact or communication with a sitting juror, usually raises a rebuttable 'presumption' of prejudice." (*Hamilton, supra,* 20 Cal.4th at p. 295.) To determine whether the verdict must be overturned, we apply the substantial likelihood test, an objective standard. (*Id.* at p. 296.) "Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including

the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no *substantial likelihood* that one or more jurors were actually biased against the defendant." (*Ibid.*) We accept the trial court's credibility determinations and findings on questions of historical fact if they are supported by substantial evidence. (*Nesler, supra,* 16 Cal.4th at p. 582.) The question of prejudice, however, is a mixed question of law and fact subject to our independent determination. (*Ibid.*)

3. *Denial of Defendants' New Trial Motions Was Not Error*

The trial court examined all jurors known to be exposed to any external influence. With each juror, the court elicited the circumstances under which any improper influence may have arisen. The court then admonished each juror on the duty to set aside whatever concerns they may have had, and instructed them to judge the case based solely on the evidence and law presented in court. After these admonishments, each juror responded affirmatively that they were able and willing to do so. The court followed proper procedure in doing so. (See *People v. Cooper* (1991) 53 Cal.3d 771, 838 [approving the trial court's individual questioning of jurors to assure each juror could follow the admonishment and decide the case on the evidence].) Furthermore, the court implicitly found each juror willing and able to adhere to her duty, and the record provides substantial evidence to support such findings. We find no evidence establishing a substantial likelihood that any juror acted in a biased manner against defendants. Thus, even assuming the record is sufficient to establish an initial presumption of prejudice on behalf of any juror, the court's examination of each juror was sufficient to rebut any such presumption.

Defendants acknowledge the trial court acted appropriately insofar as it examined the affected jurors, but defendants contend more was required. First, they contend the trial court should have examined all remaining jurors for potential bias. But the court asked each trial counsel whether he or she requested the court to do so, and each attorney

expressly declined such an inquiry. Any claim defendants raise in this regard was therefore forfeited. Furthermore, defendants point to nothing in the record to indicate the court failed to examine any juror who had been exposed to external influence. Defendants speculate that other jurors must have been exposed, but they cite to nothing in the record to support this assertion.

Second, defendants contend the trial court should have issued further admonitions to the remaining jurors regarding its questioning of the four jurors and the presence of extra security. Defense counsel requested no such admonitions, but defendants claim the trial court had a sua sponte duty to provide them. Defendants provide no authority for this proposition. Instead, they cite authorities concerning the shackling of defendants and the seating of a police officer near a defendant—circumstances not at issue here. (See *People v. Bryant* (2014) 60 Cal.4th 335, 392 [distinguishing the use of visible restraints from the provision of extra security].) At most, the case law establishes that the trial court *may* issue jury admonitions regarding extra security. (*Ibid.*)

We conclude the trial court had no sua sponte duty to admonish the remaining jurors under these circumstances. And for the reasons above, the record does not show a substantial likelihood that any juror acted in a biased manner against defendants. Accordingly, this claim is without merit.

4. *Defendants Did Not Suffer Ineffective Assistance of Counsel*

Defendants contend trial counsel were constitutionally ineffective in their failure to request further admonitions. To demonstrate ineffective assistance of counsel, defendants must first show trial counsel's performance was deficient because it fell below an objective standard of reasonableness under prevailing professional norms. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 (*Strickland*).) Second, they must show prejudice flowing from counsel's performance or lack thereof. (*Id.* at pp. 691-692.) "Prejudice exists where there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." (*People v. Benavides* (2005)

35 Cal.4th 69, 92-93, citing *Strickland, supra,* 466 U.S. at pp. 687-688, 693-694.) "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) " 'Tactical errors are generally not deemed reversible; and counsel's decisionmaking must be evaluated in the context of the available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, [the appellate court] will affirm the judgment "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . ." ' " (*People v. Hart* (1999) 20 Cal.4th 546, 623-624.) The defendant has the burden on appeal to show by a preponderance of the evidence that he or she was denied effective assistance of counsel and is entitled to relief. (*People v. Dowdell* (2014) 227 Cal.App.4th 1388.)

The record does not show why defense counsel requested no admonitions concerning the extra security. The Attorney General responds that counsel may have had tactical reasons for declining to request such admonitions. The record supports this assertion. After the trial court examined the four known jurors, the trial court asked counsel whether they wished to have the remaining jurors examined. The court reasonably pointed out that doing so would "kind of put[] a cloud over the whole proceeding" and "may very well cut against the defendants." Defense counsel, apparently in agreement with this assessment, repeatedly declined additional examinations. For the same reasons, counsel may have decided it would be unhelpful to have the jurors admonished on the extra security measures, since doing so could have emphasized the issue.

Even assuming counsel had no tactical justifications, defendants have not shown they were prejudiced by the failure to request admonitions. First, only one juror noted

64

the extra security, and that juror stated she felt safer because of it. Defendants point to nothing in the record showing any other jurors noticed the security or were made to feel unsafe because of it. Nor have defendants demonstrated a reasonable probability that any juror's decisions or deliberations were affected by the presence of extra security. Accordingly, defendants have not met their burden to demonstrate prejudice. We conclude this claim is without merit.

L. *The 20-Year Firearm Enhancement Imposed on Garcia in Count 1*

The jury found true the allegation on Count 1 that Garcia personally discharged a firearm in the commission of the offense under section 12022.53, subdivision (c). Garcia contends, however, that we must strike the 20-year enhancement on Count 1 for personally discharging a firearm because the prosecution failed to plead this allegation. The Attorney General concedes the original information did not include the allegation, but he contends the prosecution orally amended the information to include it. We conclude Garcia had adequate notice of the allegation and that he was not prejudiced by the prosecution's oral amendment of the information.

1. *Legal Principles*

Section 12022.53 sets forth enhancements for the use or discharge of a firearm in the commission of certain enumerated offenses, including murder. (§ 12022.53, subd. (a)(1).) Subdivision (c) of that section (section 12022.53(c)) imposes a 20-year term on any person who personally and intentionally discharges a firearm in the commission of the offense. Subdivision (e)(1) (section 12022.53(e)(1)) also imposes the 20-year term on any coprincipal in the offense if the coprincipal committed the offense for the benefit of a gang and any other principal in the offense falls under section 12022.53(c). Thus, even if the coprincipal does not *personally* discharge a firearm, he may liable for the 20-year term if he commits the offense for the benefit of a gang, and *some other principal* in the offense personally discharges a firearm. However, such a coprincipal cannot be sentenced to a gang enhancement in addition to the 20-year term; only the person who

65

personally discharges the firearm can be sentenced to the gang enhancement in addition to the 20-year term. (§ 12022.53, subd. (e)(2).)

Section 12022.53 further provides that the existence of any fact required under section 12022.53(c) shall be alleged in the accusatory pleading. (§ 12022.53, subd. (j).) Similarly, section 1170.1, subdivision (e), provides: "All enhancements shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact."

"[I]n addition to the statutory requirements that enhancement provisions be pleaded and proven, a defendant has a cognizable due process right to fair notice of the specific sentence enhancement allegations that will be invoked to increase punishment for his crimes." (*People v. Mancebo* (2002) 27 Cal.4th 735, 747.) However, "[d]efects in the form of an accusatory pleading are not a ground to reverse a criminal judgment in the absence of significant prejudice to a defendant. (§ 960 ['No accusatory pleading is insufficient, nor can the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form which does not prejudice a substantial right of the defendant upon the merits'].)" (*People v. Sandoval* (2006) 140 Cal.App.4th 111, 132.) Oral amendment of an accusatory pleading may suffice for statutory and due process purposes. (*Ibid.*) "The informal amendment doctrine makes it clear that California law does not attach any talismanic significance to the existence of a written information." (*Id.* at p. 133.)

   2. *Background*

As to each defendant, Count 1 of the information alleged "that *a principal* personally and intentionally discharged a firearm, a handgun, within the meaning of sections 12022.53(c) and (e)(l)." (Italics added.) The information did not allege that *Garcia* personally discharged a firearm. Nor did the information charge Lanford or Pettie with personally discharging a firearm. However, the information alleged in Counts 2 and 6 that Garcia personally *used* a firearm under section 12022.5.

66

When defendants moved for a directed verdict at the close of evidence, the trial court raised the issue of the firearm enhancements on Count 1. It appears the court misunderstood the nature of charges and believed the prosecution was charging Lanford and Pettie, in addition to Garcia, with personally discharging a firearm. The prosecution clarified that Lanford and Pettie were charged under section 12022.53(e)(1), alleging only that "a principal" had personally discharged a firearm in the commission of the attempted murder. The prosecution argued that Garcia was the only defendant seen with the gun in his hand, whereupon the court found sufficient evidence to support a finding that Garcia personally discharged the firearm. The court stated, "I have no problem as to Mr. Garcia . . . [b]ecause there is evidence from which the jury can infer that he was the one who personally discharged the firearm."

In the verdict form for the special allegations on Count 1, the court provided the option for jurors to find any of several firearm enhancements. These included the allegations that Garcia carried a firearm on his person (§ 12021.5, subd. (a)); that a principal personally used a firearm (§ 12022.53, subds. (b) & (e)(1)); that Garcia personally used a firearm (§ 12022.53, subd. (b)); that a principal personally discharged a firearm (§ 12022.53, subds. (c) & (e)(1))); and that Garcia personally discharged a firearm (§ 12022.53, subd. (c)). Garcia lodged no objections to the jury form. The jury found all allegations true.

At sentencing, the trial court imposed 20-year terms against Lanford and Pettie as coprincipals under section 12022.53(e)(1), but the court did not impose any terms against them for the gang enhancements charged in Count 1 because subdivision (e)(2) prohibited such terms. However, because the jury found Garcia had personally discharged the firearm, the court imposed the 10-year gang enhancement in addition to the 20-year term under section 12022.53(c).

67

### 3. *Garcia Had Adequate Notice of the Allegation*

Garcia contends the trial court could not have imposed terms for both the 10-year gang enhancement as well as the 20-year personal discharge enhancement because the information did not include the latter allegation. The Attorney General contends that the prosecution, in its clarification to the trial court regarding Garcia's personal discharge of the firearm, orally amended the information to include the enhancement at that point. Garcia concedes the trial court had the authority to amend the information at that stage in the proceeding, but he argues that the prosecution did not amend the information because the prosecutor did not expressly request an amendment or use the word "amend." Garcia points to no authority for the proposition that an amendment requires the use of specific words or any express invocation. Under the circumstances at issue here, the issue of the oral amendment depends largely on whether Garcia received adequate notice of the prosecution's intent to charge him with the personal discharge enhancement.

We find abundant support in the record showing that Garcia was on notice at all times that the prosecution intended to charge him with personal discharge of a firearm. First, the original complaint, the amended complaint, and the second amended complaint all expressly charged Garcia in Count 1 with personally discharging the firearm under section 12022.53(c). The amended complaints also charged Lanford and Pettie under section 12022.53(e)(1) as coprincipals in an offense in which a "principal"—who could only be Garcia—personally discharged a firearm.

Second, at the preliminary hearing in June 2013, Deputy Mull specifically testified that Degadillo said Garcia had fired the gun at him as he fled the assault. At end of the hearing, the prosecution argued that the evidence showed Garcia had personally discharged the firearm, and the court held Garcia to answer on that allegation. Garcia was thereby put on notice a year before trial that the prosecution was charging him under this theory.

68

Moreover, as Garcia acknowledges, the information charged him in Count 1 with carrying a firearm on his person (§ 12021.5, subd. (a)), and in Counts 2 and 6 with personally using a firearm (§ 12022.5, subd. (a)). Neither of these allegations were made against Lanford or Pettie; both were charged as coprincipals for an offense in which a "principal" was armed with a firearm. (§ 12022, subd. (a)(1).) That principal could only have been Garcia.

The pleadings, the preliminary hearing, the prosecutor's arguments, and the evidence adduced at trial, all taken together, unambiguously established the prosecution's theory that Garcia was the only defendant who could have personally discharged a firearm. It is inconceivable that Garcia lacked notice of this charge, and it is likewise inconceivable that he could have suffered any prejudice from the amendment of the information prior to closing arguments. Unsurprisingly, Garcia points to no such prejudice. Garcia cites to several cases for the proposition that a failure to plead an enhancement requires the allegation to be vacated without harmless error analysis, but none of those cases involved an oral amendment.

Given the circumstances described above, we conclude the amendment of the information adequately satisfied Garcia's statutory and due process rights. This claim is without merit.

M. *Imposition of the Enhancement for Carrying a Firearm Under Section 12021.5*

Garcia contends the trial court erred by imposing a 3-year term for carrying a firearm under section 12021.5, subdivision (a). The Attorney General concedes the court erred in doing so. We accept the concession.

The trial court imposed the 3-year enhancement in addition to the 20-year enhancement for personally discharging a firearm under section 12022.53, subdivision (c). But subdivision (f) of section 12022.53 provides in part: "An enhancement involving a firearm specified in Section 12021.5 . . . shall not be imposed on a person in addition to an enhancement imposed pursuant to this section." Because

the trial court imposed the 20-year enhancement, the further imposition of the 3-year enhancement was unauthorized.  Accordingly, the 3-year enhancement must be stayed. (*People v. Gonzalez* (2008) 43 Cal.4th 1118, 1123.)

N. *Cumulative Prejudice*

Defendants contend the cumulative prejudice from multiple errors requires reversal on all counts and enhancements.  Because we reverse all Pettie's convictions, this claim is moot as to him.  As to Garcia and Lanford, we are granting relief on the gang enhancements and the substantive charges in Counts 3 and 4.  The remaining charges include Count 1 (attempted murder), the assault charges in Counts 2 and 5, and the related non-gang enhancements.

For the reasons set forth in section II.H.4, any prejudice from the *Crawford* violation was isolated from the substantive charges arising from the assault. Furthermore, the trial court's failure to instruct the jury on the mens rea required for witness dissuasion is irrelevant to the attempted murder and assault charges.  The remaining defects identified above pertain only to sentencing errors.  We conclude none of the identified errors resulted in cumulative prejudice requiring further relief.

### III.    DISPOSITION

As to Pettie, the convictions on all counts are reversed.  As to Garcia and Lanford, the judgments are reversed as follows:  (1) the true findings on all gang-related enhancements under Penal Code section 186.22 are vacated; (2) all prison terms requiring a finding under section 186.22 are vacated; and (3) the convictions on Counts 3 and 4 are reversed and the prison terms based on those convictions are vacated.  As to Garcia, the 3-year term imposed under Penal Code section 12021.5, subdivision (a), is stayed.  The matter is remanded for further proceedings not inconsistent with this opinion.  If the prosecution elects not to retry Garcia or Lanford within 60 days after the filing of remittitur, under Penal Code section 1382, subdivision (a)(2), the trial court shall resentence them on the remaining counts and enhancements.

70

_____

WALSH, J.[*]

I CONCUR:

_____

PREMO, J.

*People v. Pettie et al.*
**H041739**

_____

[*]**Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.**

RUSHING, P.J., Concurring

I agree with the majority's opinion in all respects but one:  As to defendant Vincent Pettie, I would hold that the prosecution failed to present sufficient evidence to support his conviction for attempted murder.

The victim never testified to a single act or word by Pettie that would have furthered or encouraged an attempted murder.  The victim merely testified that he saw Pettie with the other men outside just before the attack.  The prosecution's sole theory of liability for attempted murder by Pettie hinged on the expert's opinion that members of a gang are expected to participate in a "beat down."  The majority concludes this opinion supports an inference by a reasonable juror that Pettie must have played some role in the attack sufficient to constitute attempted murder.

I respectfully disagree with this conclusion.  I find the required inference far too tenuous and speculative as grounds to find Pettie guilty of attempted murder beyond a reasonable doubt.  I find it particularly weak given that the trial court ruled out any argument that the "beat down" portion of the assault could have formed the actus reus of the attempted murder.  The jury must have found, as the prosecutor argued, that only the firing of the gun could have constituted the attempted murder.  But Garcia was the only person identified as having a firearm at any point during the attack.

Accordingly, I respectfully concur in the judgment, but I would hold that double jeopardy bars Pettie's retrial for attempted murder.


_____
                RUSHING, P.J.



*People v. Pettie*
H041739

Trial Court:                                    San Benito County
                                                Superior Court Nos.: CR1300100,
                                                CR1300101 and CR1300102

Trial Judge:                                    The Honorable Lee P. Felice

Attorney for Defendant and Appellant            William L. Osterhoudt
Vincent Pettie:                                 under appointment by the Court of
                                                Appeal for Appellant

Attorney for Defendant and Appellant            Randy S. Kravis
Philip Garcia:                                  under appointment by the Court of
                                                Appeal for Appellant

Attorney for Defendant and Appellant            Joseph Shipp
Andrew T. Lanford:                              under appointment by the Court of
                                                Appeal for Appellant

Attorneys for Plaintiff and Respondent          Xavier Becerra,
The People:                                      Attorney General

                                                Kamala D. Harris
                                                Attorney General

                                                Gerald A. Engler,
                                                Chief Assistant Attorney General

                                                Jeffrey M. Laurence,
                                                Acting Senior Assistant Attorney
                                                General

                                                Eric D. Share,
                                                Supervising Deputy Attorney General

                                                Alisha M. Carlile,
                                                Deputy Attorney General

*People v. Pettie, et al.*
H041739