Filed 2/19/25  In re D.R. CA2/6

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re D.R., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B331491 (Super. Ct. No. FJ57528) (Los Angeles County) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>D.R.,<br><br>    Defendant and Appellant. | |

D.R. appeals following a juvenile court order committing her to a secure youth treatment facility (SYTF) for a baseline term of seven years, with a maximum term of 15 years to life. The order was based on a finding appellant had committed murder in violation of Penal Code section 187, subdivision (a).

Appellant contends:  (1) the evidence is insufficient as to the murder true finding; (2) the court abused its discretion in

ordering the seven-year SYTF term; and (3) the predisposition custody credits should have been applied against the baseline and not the maximum exposure term.

We will affirm.

FACTUAL BACKGROUND

Appellant used to be friends with the victim Kenya and her sister Kate. In May 2021, Kate and Kenya went to a lake with appellant and her family. Appellant's boyfriend Jesse was also present.

Subsequently, Kate and Kenya visited appellant at her mother's house. Some other people came to the house. Jesse was "banging on them" and "throwing up . . . his hood" using hand gestures. Appellant grabbed Jesse, "and they locked themselves in their room." Kate and Kenya went home.

On May 26, 2021, Kate communicated with appellant via Instagram. Appellant's username was once "2ghett0.g" but was changed to "2gone.og_" at some point. During the May 26th conversation, Kate told appellant her man was "a chump." Eventually, Jesse sent a message from appellant's account stating in part: "I aint no chump . . . goes to show u the only chump u to turnt down so sit tf down u don't even know your own gang history fuck peants and they dead homies they dead family all that shit . . . LOS GANG." After a further exchange of insulting messages, Kate suggested they meet at a park.

As Kate and Kenya headed to the park, neither was carrying a weapon. When Kate reached San Pedro and 51st Street, she saw appellant and Jesse in appellant's mother's van. Appellant was driving, and Jesse was a passenger. Kate saw Jesse "throwing up" hand gestures. Kate acknowledged Jesse by saying, "'What's up.'" Appellant and Jesse went up 51st Street, and Kate lost sight of them.

2

Kate and Kenya entered the park. Kate was afraid because appellant and Jesse had remained in the car. Kate "felt like . . . something was going to go wrong." The prosecution played a video that showed appellant and Jesse driving by and shooting at Kate and Kenya. Kate testified Jesse's arm was extended out with a gun pointed at her and Kenya. Kate believed about five shots were fired, maybe more. Appellant never stopped the car.

Kenya was shot. She was transported to the hospital and ultimately died.

Appellant's sister Kayla testified at the hearing. According to Kayla, appellant said she and Jesse went to the park because Kate had challenged her to a fight. Kayla also testified she told officers that appellant had said she did not think her boyfriend was going to do what he did. Kayla agreed she told Detective Miguel Barajas that appellant said she was not going to turn in the direction of Kate and Kenya until Jesse asked her, "You're my ride-or-die. Right?" Appellant made the turn.

Detectives Barajas and Ortiz had conducted a recorded interview of Kayla. Detective Barajas testified appellant told Kayla that they shot Kenya in the leg, and it was nothing bad. It was news to appellant that Kenya had died from the gunshot. Appellant was madly in love with Jesse. The prosecutor asked Detective Barajas if Kayla ever told him that appellant had said she did not know Jesse was going to do what he did. Detective Barajas did not recall that statement being made.

The juvenile court sustained as pled the petition alleging appellant had committed Kenya's murder. As to disposition, the court indicated it had considered the probation report as well as appellant's counsel's subsequent filing, which included many mitigating circumstances. Appellant's counsel requested camp placement in lieu of SYTF commitment. While counsel

3

acknowledged that the probation report recommended SYTF commitment, counsel noted that report was over one year old.

The court stated it had "read and considered the five factors indicated in the report and listened to the argument of counsel regarding that." The court described the less restrictive alternative of camp as a "holding tank . . . ." The court indicated that given appellant's development and accomplishments, "she would best be served by SYTF through the matrix of services, [its] kind of tentacles that are out in the community . . . ." The court believed "SYTF is the best resolution for [appellant]."

The court ordered appellant committed to the SYTF for a baseline term of seven years, with a maximum term of 15 years to life. The minute order states appellant's predisposition credits are to be applied to the maximum term of confinement.

DISCUSSION

*Sufficiency of the Evidence*

Appellant contends the evidence was insufficient as to the murder true finding. We disagree.

"Our task is clear. 'On appeal we review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Cravens* (2012) 53 Cal.4th 500, 507.) "Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal." (*People v. Zamudio* (2008) 43 Cal.4th 327, 358.) "[A]ppellant has a heavy burden in demonstrating that the evidence does not support the juvenile court findings." (*In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1136.)

Here, substantial evidence supports the conclusion that appellant aided and abetted the implied malice murder of Kenya. "'[D]irect aiding and abetting is based on the combined actus reus of the participants and the aider and abettor's own mens rea. [Citation.] In the context of implied malice, the actus reus required of the perpetrator is the commission of a life endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life-endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life.'" (*People v. Reyes* (2023) 14 Cal.5th 981, 990-991 (*Reyes*).) "Mental state and intent are rarely susceptible of direct proof and must therefore be proven circumstantially." (*People v. Thomas* (2011) 52 Cal.4th 336, 355.)

The record contains substantial evidence to support each required element. As to the actus reus, appellant's driving of the car aided Jesse's life-endangering act of firing multiple bullets at Kate and Kenya. Regarding the mens rea, the key question is whether the record discloses substantial evidence appellant knew Jesse intended to shoot at Kate and Kenya. We conclude it does.

On the day of the murder, Jesse used appellant's Instagram account to feud with Kate. Their heated exchange referenced gangs. As appellant drove Jesse by Kate and Kenya the first time, he threw hand gestures—just as he did on the prior occasion wherein appellant grabbed Jesse and locked him away.

5

Appellant's behavior during that prior incident suggests an awareness that Jesse was prone to escalation in such situations.

Between appellant's first and second pass by Kate and Kenya, Jesse escalated from throwing signs to shooting bullets. Appellant's initial intent not to turn in the direction of Kate and Kenya evinces knowledge of Jesse's own intent. Jesse himself signaled his intent to shoot when he asked appellant, "You're my-ride-or-die. Right?" With the situation clarified, a lovestruck appellant made the turn. Appellant was Jesse's ride, and Kenya died. After the shooting, appellant even admitted to her sister that they had shot Kenya. Substantial evidence supports the juvenile court's true finding.

Appellant notes that mere presence does not amount to aiding and abetting. (*People v. Pettie* (2017) 16 Cal.App.5th 23, 57-58.) However, her conduct far exceeded mere presence. Appellant drove Jesse to the murder victim not once, but twice. As the juvenile court observed, the second pass converted her conduct "from driving to hunting."

### Abuse of Discretion

Appellant asserts the juvenile court abused its discretion in ordering appellant to a seven-year SYTF term. Appellant has failed to demonstrate abuse of discretion.

A juvenile court may order SYTF commitment if certain criteria are met. (Welf. & Inst. Code, § 875, subd. (a)(1)-(3).)[1] Of significance here, the court must make "a finding on the record that a less restrictive, alternative disposition for the ward is unsuitable." (*Id.*, subd. (a)(3).)

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

In making this unsuitability determination, "the court shall consider all relevant and material evidence, including the recommendations of counsel [and] the probation department . . . ." The court shall additionally make its determination based on the following five criteria: "(A) The severity of the offense or offenses for which the ward has been most recently adjudicated, including the ward's role in the offense, the ward's behavior, and harm done to victims. [¶] (B) The ward's previous delinquent history, including the adequacy and success of previous attempts by the juvenile court to rehabilitate the ward. [¶] (C) Whether the programming, treatment, and education offered and provided in a secure youth treatment facility is appropriate to meet the treatment and security needs of the ward. [¶] (D) Whether the goals of rehabilitation and community safety can be met by assigning the ward to an alternative, less restrictive disposition that is available to the court. [¶] (E) The ward's age, developmental maturity, mental and emotional health, sexual orientation, gender identity and expression, and any disabilities or special needs affecting the safety or suitability of committing the ward to a term of confinement in a secure youth treatment facility." (§ 875, subd. (a)(3)(A)-(E); see also § 725.5.)

"[T]he juvenile court has long enjoyed great discretion in the disposition of juvenile matters . . . ." (*In re Greg F.* (2012) 55 Cal.4th 393, 411.) "We review the court's placement decision for an abuse of discretion. [Citation.] We review the court's findings for substantial evidence, and "'[a] trial court abuses its discretion when the factual findings critical to its decision find no support in the evidence.'"" (*In re Nicole H.* (2016) 244 Cal.App.4th 1150, 1154 (*Nicole H.*).) """In determining whether there was substantial evidence to support the commitment, we must examine the record presented at the disposition hearing in light

of the purposes of the Juvenile Court Law,"""" which include promoting public safety and the juvenile offender's rehabilitation. (*In re Carlos J.* (2018) 22 Cal.App.5th 1, 5; see also § 202, subd. (b) ["Minors under the jurisdiction of the juvenile court as a consequence of delinquent conduct shall, in conformity with the interests of public safety and protection, receive care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances"].)

The juvenile court did not abuse its discretion. In accordance with section 875, the court indicated it considered the probation report, as well as the argument and mitigation evidence appellant's counsel provided. The court further indicated it considered the five factors enumerated in section 875, subdivision (a)(3)(A)-(E). The first of those factors—the severity of the offense—strongly supported SYTF commitment. (§ 875, subd. (a)(3)(A).) Appellant aided and abetted murder, among the gravest of crimes. Appellant's conduct seriously jeopardized Kate's life as well.

The juvenile court did not limit its focus to the offense's severity. Counsel stated the court knew "this is [appellant's] first arrest," and the court acknowledged there had been "no previous attempt at rehabilitation under the system." (See § 875, subd. (a)(3)(B).) The court's ruling referenced factors like age, developmental maturity, and mental health under section 875, subdivision (a)(3)(E). The court determined SYTF would afford appellant a variety of services. (§ 875, subd. (a)(3)(C).) The probation report, which listed available services, substantiates this determination. The court also rejected camp as a holding tank evidently lacking the same degree of services. (§ 875, subd. (a)(3)(D).) Moreover, the court was not required to attempt a less

8

restrictive placement like camp before ordering SYTF.  (Cf. *Nicole H.*, *supra*, 244 Cal.App.4th at p. 1159.)  Although appellant had shown progress after exhibiting some behavioral issues in juvenile hall, the court did not abuse its discretion in concluding that SYTF, with its matrix of services, was the appropriate resolution.

*Predisposition Credits*

Appellant contends her predisposition credits should have been applied against the baseline SYTF term and not the maximum exposure term.  We conclude the credits are properly applied to the maximum term of confinement.

Appellant's claim raises, in the first instance, a question of statutory interpretation.  "Where there is an issue of statutory interpretation, courts will review such questions de novo . . . ." (*Fair Education Santa Barbara v. Santa Barbara Unified School District* (2021) 72 Cal.App.5th 884, 895.)

Section 875, subdivision (c) addresses the maximum term of confinement, which "represent[s] the longest term of confinement in a facility that the ward may serve . . . ."  (§ 875, subd. (c)(1).)  Subdivision (c)(1)(C) provides:  "Precommitment credits for time served must be applied against the maximum term of confinement as set pursuant to this subdivision."  (*Id.*, subd. (c)(1)(C); see also Cal. Rules of Court, rule 5.804(c) ["The court must apply the youth's precommitment credits to the maximum term"].)  The statute unambiguously requires application of credits to the maximum term of confinement. Because "the statutory language is unambiguous, 'we presume the Legislature meant what it said, and the plain meaning of the statute governs.'"  (*People v. Toney* (2004) 32 Cal.4th 228, 232)

Citing *In re Ernesto L.* (2022) 81 Cal.App.5th 31, appellant asserts an equal protection violation based on alleged disparate

9

treatment of youths under the Division of Juvenile Justice (DJJ) and SYTF schemes. Appellant concludes her "credits should be applied to the baseline term of seven years . . . ." Our First District colleagues have rejected the argument that "equal protection principles require application of precommitment credits against the baseline term." (See *In re M.B.* (2024) 99 Cal.App.5th 435, 445.) For the reasons explained in that cogent opinion, we likewise reject appellant's equal protection argument. (See *id.* at p. 467 ["Section 875, subdivision (c) thus directs that, for SYTF placements, precommitment credits are to be applied in the same way *Ernesto L.* held they should be applied in the DJJ setting . . . . [T]here is no disparate treatment that could give rise to an equal protection problem."].)

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

CODY, J.

We concur:

YEGAN, Acting P. J.

BALTODANO, J.

10

Benjamin R. Campos, Commissioner
Superior Court County of Los Angeles

_____

Courtney M. Selan, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Rama R. Maline, Deputy Attorney General, for Plaintiff and Respondent.